IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

THE CITY OF FRESNO,

Plaintiff,

vs.

UNITED STATES OF AMERICA, et al.,

Defendant.

No. CV-F-06-1559 OWW/TAG

ORDER DENYING WITHOUT PREJUDICE UNITED STATES' MOTION TO STAY PLAINTIFF'S CERCLA AND HSAA CLAIMS (Doc. 24)

The City of Fresno, proceeding pursuant to a First Amended Complaint, has sued the United States of America, the United States Army Corps of Engineers, the National Guard Bureau (collectively referred to as the United States), and The Boeing Company. The First Amended Complaint alleges that the action arises from Defendants' unlawful polluting and contamination of soil and groundwater in connection with their, repair, maintenance, overhaul, and refurbishing of aircraft at the former World War II military base, Hammer Field Army Air Base (referred

to as Old Hammer Field or OHF), located in the area that is know Fresno-Yosemite International Airport, which is owned by the City. The First Amended Complaint alleges in pertinent part:

**City's Efforts to Ensure Investigation and Clean Up by All Responsible Parties**

> 48. During the preliminary investigations in the early 1990's identifying the source of VOC contamination in the downgradient ground water as coming from the OHF property, the City,which has never conducted any industrial operations at OHF causing VOC contamination, worked cooperatively with the State to identify the potentially responsible parties ("PRPs") for the existing contamination both on and off of the OHF property.
>
> 49. The City was identified by the State as a PRP solely because of its ownership of the OHF property - not because the City conducted any contaminating activities at OHF.
>
> 50. Through the City and State's efforts, Boeing and the United States Defendants were identified by the State as PRPs responsible for the activities, conduct and omissions that caused or permitted the release of contaminants at the Property.

**PRP Cooperative Agreement**

> 51. On July 30, 1993, the City and the United States Defendants entered into the "State of California Potentially Responsible Party Agreement For: Old Hammer Field ("OHF")" (the "Cooperative Agreement") agreeing to conduct the necessary response actions at OHF pursuant to requirements under the federal Superfund law (CERCLA) and the State equivalent to CERCLA, the Hazardous Substances Account Act ("HSAA"). The purpose of the Cooperative Agreement was to establish requirements for the performance of and funding for the investigation, clean up and response actions at OHF, including the initial investigation through a Preliminary Assessment/Site Inspection ("PA/SI"), the Remedial Investigation ("RI") and Feasibility

Study ("FS") to identify, evaluate and select the final remedial action for OHF, and finally to prepare and implement any necessary Remedial Design/Remedial Action through a Remedial Action Plan ("RAP").

52. The Cooperative Agreement also set forth the procedure the State would follow to determine a non-binding preliminary allocation of responsibilities ("NBAR") between the parties to share in the costs associated with the activities contemplated in the Cooperative Agreement. On December 23, 2003, the State issued its NBAR, which allocated five percent of the responsibility for OHF activities to the City (consistent with the City's only involvement at OHF as a property owner), thirty percent to Boeing; and sixty-five percent to the United States Defendants. A copy of the NBAR is attached as **Exhibit D** to this Complaint. The United States Defendants were the only parties that were assessed a great enough percentage to have initiated arbitration to dispute the State's NBAR determination. However, the United States Defendants never disputed the nonbinding allocation amount assigned to them by the State.

53. The Cooperative Agreement establishes the Department of Toxic Substances Control ("DTSC") as the State lead agency for OHF activities and the Regional Water Quality Control Board ("RWQCB") as the State support agency for OHF activities.

**Rockwell/Boeing Imminent and Substantial Endangerment Order**

54. Boeing did not enter into the Cooperative Agreement, so the State instead issued an Imminent or Substantial Endangerment Order and Remedial Action Order against Boeing on October 4, 1994 ("Boeing Order"). The Boeing Order requires Boeing to perform investigation, clean up and remediation activities in accordance with the Boeing Order, the Cooperative Agreement and the Cost Sharing Agreement (discussed below).

**Cost Sharing Agreement**

55. To ensure that the proper investigation and clean up activities progressed, on February 19, 1993, the City entered into an agreement with the United States Defendants and Boeing to fund shared costs to address the contamination on, under, adjacent to and downgradient from OHF (the "Cost Sharing Agreement").

56. The Cost Sharing Agreement contains a preliminary interim allocation of costs and discussion of the performance of particular tasks associated with the investigation, clean up, response and remediation at OHF. Over time, the City has entered into additional amendments for additional interim allocations of costs and tasks associated with the investigation, clean up, response and remediation at OHF with certain of the Defendants.

57. Under the Cost Sharing Agreement and its amendments, the City has overpaid a significantly disproportionate share of the costs - an amount that is not consistent with the City's role as the nonpolluting landowner - to ensure the ongoing investigation, clean up, response and remedial action at OHF. In other words, to date, the City has paid interim costs to conduct the necessary response activities associated with contaminants at OHF and implementation of remediation activities well in excess of the non-binding share the State determined was a fair allocation for the City.

**Investigation and Adoption of the Remedial Action Plan for OHF**

58. Under the oversight of the DTSC and RWQCB, a series of environmental investigations and assessments were conducted between 1991 and May 26, 2004, when the State approved the final Remedial Action Plan ("RAP") for OHF (the "OHF RAP"), which sets out the preferred clean up plan alternative approved by the State after stakeholder comment and participation in the process.

59. During the time between the initiation of the investigatory work in 1991 and adoption

of the OHF RAP in May 2004, the State approved the interim remediation action of pumping Well 70 at high volumes, treating the water to meet federal standards, so that Well 70 could be used to stop or at least significantly limit the downgradient migration of the OHF contaminant plume.

60. The City began operating Well 70 as part of the interim remediation plan in 1999. While there was an agreement between the City and the Defendants for the City to pay for the costs of operating Well 70 for three years, after that, the costs of operating and treating Well 70 became part of the necessary costs of response associated with the remediation, clean up and response costs at OHF. Despite the significance of Well 70 as an interim remedial measure, neither Boeing nor the United States Defendants have ever contributed their fair share towards the necessary ongoing operational costs of Well 70, agreeing only in 2006 to pay for a portion of the 2005 operational costs. At all other times, the City has been the only party that has paid the necessary costs of response to ensure the continued operation and treatment of Well 70.

61. The State-approved OHF RAP contains four major components the State believed necessary to obtain final remediation and clean up at OHF: (1) source treatment (through soil vapor extraction and chemical oxidation injections) in the vicinity of the Hangar P-3/T-282 area; (2) continued pumping, extracting and treating water from Well 70 at rates sufficient to "stop" most of the contamination from migrating further downgradient; (3) installation of some additional wells downgradient from Well 70 to create a "back-stop" to any other contaminants that escape beyond Well 70's zone of influence (the so-called "toe-of-plume" remediation); and (4) ongoing and future monitoring activities to assess the viability of the other activities.

62. The OHF RAP implementation began in 2005, with the capital construction of the source treatment systems.

**Compliance with the National Contingency Plan and Applicable State Equivalents**

63. Since 1989, all of the investigations, clean up, response and remedial actions have been conducted under the oversight of the State, through DTSC and RWQCB, in accordance with the governing regulations. As such, all activities conducted at OHF, or relating to contamination on, under, adjacent to or downgradient from OHF have been conducted in compliance with the requirements of the NCP regulations and the requirements of the State statutes, regulations and Executive Orders governing implementation of remediation, removal, response, clean up, investigation and abatement under HSAA, the State equivalent to CERCLA.

64. A Public Participation Plan ("PPP") for OHF activities was prepared and approved by the State in 1992 and has been fully implemented since that time.

**Boeing and the United States Defendants' Refusal to Fund Additional Clean Up Activities**

65. Beginning in 2002, Boeing refused to pay, even on an interim basis, for the investigation and clean up at, under, adjacent to, or downgradient from OHF. Boeing paid nothing to continue ongoing investigation and clean up activities in 2003 and 2004, including development of the OHF RAP, while the City paid far more than its fair share during both those years to ensure that Boeing's refusal to pay did not stop the ongoing clean up and investigation at OHF, including the development of the final remediation plan.

66. In 2005, the United States Defendants failed to request funds through their normal budgetary process to continue meeting their clean up obligations during 2006.

67. Despite the Defendants' recalcitrance and refusal over time and presently to fund their fair share of the ongoing investigation and clean up costs for OHF, the City is the sole party that has continually contributed money

to implement the OHF RAP. Unlike Boeing and the United States Defendants, for nearly a five month period in 2006, the City continued, at its sole cost and expense, to operate and treat Well 70 as contemplated in the OHF RAP and to protect the health or environment of its citizens, while the United States Defendants and Boeing made no further monetary contributions past allocations they made in 2005 for fiscal year 2005.

68. On August 7, 2006, the City informed DTSC that, because of the failure of ongoing funding from all of the PRPs, ERM, the parties' environmental consultant, had informed the PRPs that there were no remaining funds to continue the implementation of the OHF RAP, that the remediation systems would be shut down, and that all further activities conducted by ERM at OHF would cease as of August 11, 2006.

69. No further funds were secured, and except for the continued operation and treatment of Well 70 solely funded by the City (a non-operating landowner who never used the solvents causing the contamination at OHF), all other ongoing remediation and monitoring activities required under the OHF RAP ceased on August 11, 2006.

**State Order to PRPs**

70. After being informed of the funding impasse, on September 19, 2006, the State issued separate letters to Boeing, the United States Defendants and the City directing each party to start up the required activities pursuant to the OHF RAP.

71. After receipt of such request from the State, the City, unlike Boeing and the United States Defendants, continued to fund the pumping and treating of Well 70, an integral component of the OHF RAP. In contrast, Boeing and the United States Defendants took no action, and continued their pattern of not funding or committing to fund any necessary response activities associated with the implementation of the OHF RAP.

72. On October 20, 2006, the RWQCB issued its "Monitoring and Reporting Program Order No. R5-2006-0810, Old Hammer Field Area 1 Source Area Groundwater Cleanup, Fresno, Fresno County" (the "MRP") to require the parties to initiate monitoring and reporting according to the schedules set forth in the MRP.

73. On October 31, 2006, based on the failure of Boeing and the United States Defendants to continue funding for the OHF RAP, the DTSC issued both an Amendment to the Boeing Order (the "Amended Boeing Order"), and an Imminent or Substantial Endangerment Determination and Order and Remedial Action Order against the United States Defendants and the City (the "DTSC Order") (collectively the "State Orders"), requiring all parties unilaterally, jointly and severally to immediately ensure that all required activities under the OHF RAP move forward in accordance with the enforceable schedule.

74. In response to the DTSC Order and the Amended Boeing Order, on December 1, 2006, the City, the United States Defendants and Boeing reached an agreement to fund a portion of the activities required in the State Orders, and the Soil Vapor Extraction System at OHF was restarted on December 21, 2006.

75. Based on the limited funds that the United States Defendants can now commit to, the combined funding from the City, Boeing and the United States Defendants will only ensure continued implementation of the OHF RAP clean up activities through the first quarter of 2007 (through March 31, 2007), based on the DTSC-approved schedule of necessary clean up activities.

76. On December 20, 2006, the United States Defendants requested that the DTSC withdraw the DTSC Order "insofar as it applies to the [United States Defendants]" based in part on the United States Defendants' belief that, because of the agreement for additional funding through March 2007, "the order(s) no longer serves any purpose."

77. In a January 4, 2007 letter from Anthony

> J. Landis, P.E. of the DTSC responding to the United States Defendants' request, the DTSC stated that it "will not be rescinding or amending the [DTSC Order] at this time."

The First Amended Complaint alleges twelve claims for relief. The First Claim for Relief is against all Defendants for implied contribution pursuant to CERCLA § 107(a), 42 U.S.C. § 9607 and seeks "recovery of necessary costs of response and payment from all Defendants in the nature of implied contribution for the City's equitable share of all past, present, and future necessary response costs incurred in response to the release of hazardous substances at or affecting OHF". The City alleges that "Defendants, and each of them, are jointly and severally liable to the City pursuant to 42 U.S.C. § 9607(a) for all or part of the past, present, and future necessary costs of response ...."

The Second Claim for relief is against all Defendants for contribution pursuant to CERCLA § 113(f)(3), 42 U.S.C. § 9613(f). It is alleged that the Cooperative Agreement is an administrative settlement within the meaning of Section 9613(f)(3)(B) and that the DTSC Order and the Amended Boeing Order are adminstrative orders within the meaning of Section 9613(f). The City "seeks payment from all Defendants in the nature of contribution for the City's equitable share of all past, present and future response costs incurred in response to the release of hazardous substances at or affecting OHF", alleging that "Defendants, and each of them, are liable to the City pursuant to 42 U.S.C. § 9613(f) for contribution of the costs that the City has paid in excess of its

fair share for all or part of the past, present, and future necessary costs of response ....”

The Third Claim for Relief is against all Defendants for implied contribution pursuant to Health & Safety Code § 25363(e) and for treble damages pursuant to Health & Safety Code § 25398.17.[1]

Defendants United States move for a stay of the City’s claims asserted in the First, Second and Third Claims for Relief.

The motion for stay is opposed by the City and Defendant Boeing.

The United States requests a stay of these three claims for relief until after the United States Supreme Court issues its decision in *United States v. Atlantic Research Corp.*, No. 06-562. According to the Supreme Court’s docket, the issue presented to the Supreme Court in *Atlantic Research Corp.* is:

> Whether a party that is potentially responsible for the cost of cleaning up property contaminated by hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. 9601 et seq., but that does not satisfy the requirements for bringing an action for contribution under Section 113(f) of CERCLA, 42 U.S.C. 9613(f), may bring an action against another potentially responsible party under Section 107(a), 42 U.S.C. 9607(a).

According to the Supreme Court’s docket, argument is set for

---

[1]The Fourth Claim for Relief is against all defendants the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a). The Fifth through Eleventh Claims for Relief are against Boeing based on common law causes of action. The Twelfth Claim for Relief is against all defendants for declaratory relief.

April 23, 2007.

42 U.S.C. § 9607(a) authorizes suits against statutorily defined responsible parties, known as PRPs, to recover costs incurred in cleaning up hazardous waste sites. *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1300 (9th Cir.1997), *cert. denied*, 524 U.S. 937 (1998). CERCLA § 113(f), 42 U.S.C. § 9613(f) provides in pertinent part:

> (1) Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section ... 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section ... 9607 of this title.
>
> (2) A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liablel persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

In *Pinal Creek Group*, a group composed of three mining companies engaged in the voluntary cleanup of hazardous waste site brought an action under CERLCA against other PRPs, asserting claims for the totality of its cleanup costs and seeking imposition of joint and several liability. The Ninth Circuit concluded:

> Because all PRPs are liable under the statute, a claim by one PRP against another PRP necessarily is for contribution. A PRP's contribution liability will correspond to that party's equitable share of the total liability and will not be joint and several. CERCLA simply does not provide PRPs who incur cleanup costs with a claim for the joint and several recovery of those costs from other PRPs ....
>
> ...
>
> Because a claim asserted by a PRP under § 107 requires the application of § 113, a PRP is limited to a contribution claim governed by the joint operation of §§ 107 and 113. Therefore, we hold that, under CERCLA, a PRP does not have a claim for the recovery of the totality of its cleanup costs against other PRPs and a PRP cannot assert a claim against other PRPs for joint and several liability.

*Id.* at 1301, 1306.

In *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004), the Supreme Court construed the term "during or following any civil action under section ... 9607(a)" in Section 9613(f) to mean that a party that had incurred response costs directly, but who had not been sued under for contribution under Section 9607(a), could not proceed under Section 9613(f).

In *Atlantic Research Corp. v. United States*, 459 F.3d 827 (8th Cir.2006), the Eighth Circuit concluded that Section 9613(f) is not a liable party's exclusive remedy and allowed a claim for direct recovery under Section 9607(a). Atlantic Research Corp. had retrofitted rocket motors for the United States at a site in Arkansas. Residue from burnt rocket fuel contaminated the soil and groundwater. Atlantic voluntarily investigated and cleaned

up the contamination, incurring costs in the process. Atlantic sought to recover a portion of these costs from the United States by invoking CERCLA §§ 107(a) and 113(f). Atlantic and the United States began to negotiate in an effort to resolve these financial matters. During these negotiations, the Supreme Court issued its opinion in *Cooper Industries, Inc. v. Aviall Services, Inc.* Because no action had been commenced against Atlantic under § 107(a), the *Aviall* decision barred its § 113(f) contribution claim against the United States. Atlantic then amended its complaint and relied solely on § 107(a) and federal common law. The district court granted the United States' motion to dismiss, concluding that the Eighth Circuit's pre-*Aviall* decision in *Dico, Inc. v. Amoco Oil Co.* foreclosed Atlantic's § 107 claim. The Eighth Circuit reversed the district court, concluding that *Dico* is clearly distinguishable from the case at bar and that its analytic is undermined by *Aviall*. Agreeing with the decision in *Consolidated Edison Co. v. UGI Utilities, Inc.*, 423 F.3d 90 (2nd Cir.2005), the Eighth Circuit ruled in pertinent part:

> ... We ... hold that it no longer makes sense to view § 113 as a liable party's exclusive remedy. This distinction may have made sense for parties such as Dico, which was allowed to seek contribution under § 113. But here, Atlantic is foreclosed from using § 113. This path is barred because Atlantic - like Aviall - commenced suit before, rather than 'during or following,' a CERCLA enforcement action. Atlantic has opted to rely upon § 107 to try to recover its cleanup costs exceeding its own equitable share. We conclude that it may do so.

459 F.3d at 835. The Supreme Court granted *cert.* to address:

> Whether a party that is potentially responsible for the cost of cleaning up property contaminated by hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. 9601 et seq., but that does not satisfy the requirements for bringing an action for contribution under Section 113(f) of CERCLA, 42 U.S.C. 9613(f), may bring an action against another potentially responsible party under Section 107(a), 42 U.S.C. 9607(a).

The United States argues that, because the City is a PRP, the Supreme Court's decision in *Atlantic Research Corp.* will determine whether the City may properly bring an action against the Defendants under Section 9607(a). If the First Claim for Relief is stayed pending the Supreme Court's decision, the United States argues that the Second Cause of Action, which alleges that the Cooperative Agreement is an administrative settlement within the meaning of Section 9613(f)(3)(B) and that the DTSC orders issued in October 2006 are administrative orders within the meaning of Section 9613(f)(1), should be stayed as well. The United States asserts that it disagrees with the City's position and intends to file a dispositive motion with respect to the Second Claim for Relief after *Atlantic Research Corp.* is decided by the Supreme Court.

With regard to the Third Claim for Relief, the United States contends that it should be stayed because "HSAA is the California counterpart to CERCLA" and "[t]hough not identical to the federal statute, it contains many of the same concepts.

The United States argues that it makes little sense to

litigate the City's CERCLA and HSAA claims in light of the Supreme Court's "imminent" decision in *Atlantic Research Corp.* Discovery will involve review and production of thousands of documents dating back to the early 1940s, located in various parts of the country, as well as the depositions of individuals who may be knowledgeable about the historical activities at OHF. The United States represents that the City's counsel has advised that it may retain seven expert witnesses to establish its case in chief. The United States argues that, in light of the burdens and complexities of discovery in this case, efficiency and judicial economy will be promoted by waiting a few months, in light of the possibility that the Supreme Court may rule that a party such as the City has no claim under Section 9607(a) as a matter of law.[2]

Both the City and Boeing argue that the Supreme Court's ruling in *Atlantic Research Corp.* will not be dispositive of the City's CERCLA and HSAA claims for relief. The City asserts that, no matter what the Supreme Court rules in *Atlantic Research Corp.*, that opinion will not provide any judicial direction with

---

[2]The issue discussed by the Eighth Circuit in *Atlantic Research Corp.* is presently pending on appeal in the Ninth Circuit in several cases. From the dockets, the briefing is not yet complete and it may be assumed that the Ninth Circuit will await the Supreme Court's ruling before addressing the pending appeals. The United States notes that Judge Shubb in *Adobe Lumber, Inc. v. Hellman*, 415 F.Supp.2d 1070, 1079 (E.D.Cal.2006), issued a stay pending resolution of the Ninth Circuit appeals and complains that the City and Boeing have "even attempted" to distinguish *Adobe Lumber*. This court is not in any way bound by Judge Shubb's ruling.

respect to whether the City meets the requirements for bringing a direct contribution claim under Section 9613(f), which the City contends it does.

The United States replies that although the question presented to the Supreme Court in *Atlantic Research Corp.* does not involve Section 113(f), the Supreme Court's interpretation of Section 107(a) will have a direct practical impact on the City's Second Claim for Relief:

> [I]f the Supreme Court concludes that potentially responsible parties such as Plaintiff have an implied right to contribution under Section 107(a), there will be no need for this Court to adjudicate whether Plaintiff has a viable claim under Section 113(f), as Plaintiff will have at least one basis to assert a contribution claim. On the other hand, if Plaintiffs [sic] have no section 107(a) claim, it would make more sense to test the sufficiency of the remaining Section 113(f) claims before proceeding with full-fledged CERCLA discovery.

Boeing appears to concede that if the Supreme Court reverses the Eighth Circuit in *Atlantic Research Corp.*, a private party that has directly incurred response costs has no right to seek recovery under CERCLA. However, Boeing argues, it is not clear that the Supreme Court's decision in *Atlantic Research Corp.* will have any impact on the City's Third Claim for Relief under the HSAA. Boeing contends that the HSAA does not have a provision equivalent to Section 9613(f). Health & Safety Code § 25363(e) provides in pertinent part:

> Any person who has incurred removal or remedial action costs in accordance with this

> chapter or the federal act may seek contribution from any person who is liable pursuant to this chapter ....

Boeing argues that the HSAA authorizes a contribution claim without respect to whether there is a prior civil action or whether there is an implied right of contribution under CERCLA § 107(a), Section 9607(a).

In reply, the United States concedes that *Atlantic Research Corp.* may bear on HSAA issues, but contends that it does not make sense to stay the CERCLA claims while proceeding on the HSAA claim, because both statutes are directed at the purpose of cost recovery, even though the language in the statutes is not identical.

Both the City and Boeing argue that a stay of the First, Second and Third Claims for relief pending the Supreme Court's opinion in *Atlantic Research Corp.* will not promote efficiency and judicial economy and could potentially prejudice the parties to this action. They note that the requested stay will not affect the Fourth Claim for Relief against the United States and Boeing under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a) and will not affect discovery of the common law claims asserted by the City against Boeing. Staying the three causes of action will cause confusion and conflict because the City and Boeing will continue to propound discovery to the United States which they may believe relevant to the unstayed claims but the United States may argue is relevant to the stayed claims. Further, if the CERCLA claims are found viable by the

Supreme Court, there may well be a need for repetitive discovery. Finally, the City and Boeing argue that any stay of discovery will be prejudicial because the witnesses with knowledge of the activities at OHF are elderly, based on the seventy-year history of OHF. They claim that staying discovery will complicate the ability of the parties to preserve testimony and will likely result in petitions to conduct depositions to preserve testimony. The City and Boeing note that the United States claims no prejudice to it if the requested stay is not entered.

The United States replies that neither the City nor Boeing identify any witnesses who are in poor health nor any documents that might not be obtained if the stay is granted. The United States notes that the City has filed a motion for preliminary injunction directed to the City's claim against the United States and Boeing under the RCRA, which motion is presently set for hearing in late May, 2007. The United States represents that it intends to file a dispositive counter-motion so that both motions can be resolved at the same time. Therefore, the United States asserts, the RCRA claim is likely to be the focus of attention while these motions are briefed, argued and decided. During this phase of litigation, and while the Supreme Court is considering *Atlantic Research*, there is no need to move forward on the CERCLA and HSAA discovery.

The Supreme Court recognizes that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy

of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North America Co.*, 299 U.S. 248, 254-255 (1936). "The proponent of the stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). Thus, the moving party "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis*, 299 U.S. at 355.

Given these standards, the motion to stay the First, Second and Third Claims for Relief is DENIED. The United States does not deny it is a PRP at the OHF site. The law regarding contribution is in flux. The United States has not shown it has no responsibility in this case as a matter of law. Given the need to conduct discovery of elderly witnesses, preserve evidence, and the fact that the other claims for relief will proceed, there is no prejudice to the United States in proceeding to defend this lawsuit pending the Supreme Court's decision in *Atlantic Research Corp.*[3]

///

///

[3]As stated at the hearing, as long as the DTSC Order and the Amended Boeing Order is being currently funded, and for case management purposes, the parties are expected to meet and confer to limit discovery efforts and costs to what is really necessary to litigate the City's RCRA claim.

IT IS SO ORDERED.

**Dated: April 10, 2007**

**/s/ Oliver W. Wanger**
UNITED STATES DISTRICT JUDGE