UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF FRESNO,<br><br>                      Plaintiff,<br><br>   v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>              Defendants. | No. CV-F-06-1559-OWW-TAG<br><br>MEMORANDUM DECISION RE: DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS OR FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF'S RCRA CLAIM; MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS AS TO PLAINTIFF'S HSAA CLAIM (Docs. 142 & 143.) |

## I.   <u>INTRODUCTION</u>.

This is a dispute over environmental remediation between Plaintiff City of Fresno (the "City") and Defendants the Boeing Company ("Boeing"), the United States Army Corps of Engineers, and the National Guard Bureau (collectively, the "United States"). The dispute concerns the environmental remediation of Old Hammer Field ("OHF") in Northeast Fresno, a site presently occupied by the Fresno-Yosemite International Airport. This site was used by the United States as an Army Air base during World War II. In 1946, the United States transferred the property to Plaintiff, which has since owned and controlled it. Boeing's predecessor, North American Aviation, was one of Plaintiff's tenants of the property in the 1950s.

The City of Fresno has sued the United States and Boeing in a Second Amended Complaint ("SAC") under CERCLA, RCRA, HSAA, as well as various state law theories.  Plaintiff alleges that it "has shouldered, and continues to shoulder, a disproportionate share of the past, present and ongoing costs associated with the investigation and clean up of the OHF property, as well as off-site areas affected by Defendants' polluting activities."  (SAC ¶ 4.) Plaintiff requests a "declaration of responsibility and payment from Defendants for their fair share of all past, present and future responses costs [sic] incurred in response to Defendants' release of hazardous substances, wastes, materials and pollutants." (Id. ¶ 6.)  Plaintiff also seeks monetary and injunctive relief.[1]

Before the court for decision are two motions brought by Defendant United States: (1) for partial judgment on the pleadings or partial summary judgment as to Plaintiff's fourth claim under the RCRA; and (2) for partial judgment on the pleadings as to Plaintiff's third claim under the HSAA.

Defendant's RCRA motion challenges subject matter jurisdiction over this claim under § 113(h) of CERCLA.  Defendant also argues that the claim is moot because the activities Plaintiff seeks to enjoin are already underway, under the doctrine of primary jurisdiction, and because there is no imminent and substantial endangerment at OHF as required under Plaintiff's RCRA claim.  The HSAA claim is allegedly infirm because the United States has not

---

[1] Specifically, Plaintiff seeks a "preliminary injunction and permanent injunction directing Defendants [...] to investigate and remediate completely the contamination on, under, adjacent to or downgradient from OHF and the surrounding areas in an expeditious manner."  (Doc. 123-3. 36:24-36:27.)

**2**

1  unequivocally waived its sovereign immunity.

2      These motions were originally filed on April 23, 2007 and
3  renoticed on August 20, 2009.  Although the arguments in the
4  original motions and renewed motions are largely the same, there is
5  one important distinction: Plaintiff now alleges that 1,2,3-
6  trichloropropane ("TCP") has leached into the City's water supply,
7  allegedly from the federal facilities located on or near OHF.  The
8  alleged presence of TCP - and its effect on the current remediation
9  plan - drives the current dispute.

10

11          II. __FACTUAL/PROCEDURAL BACKGROUND__.

12      This case involves the cost, scope, and progress of
13  environmental remediation activities conducted by Plaintiff City of
14  Fresno, Boeing, and the United States at Old Hammer Field ("OHF"),
15  a site presently occupied by the Fresno-Yosemite International
16  Airport.  This site was used as an Army Air base during the World
17  War II years.[2]  Boeing's predecessor, North American Aviation
18  ("NAA"), was one of Plaintiff's tenants of the property in the
19  1950s.

20      The State of California, through its Department of Toxic
21  Substances Control ("DTSC") and the Regional Water Quality Control
22  Board ("RWQCB") ("State Agencies") has oversight over the cleanup.
23  The parties work together as the Old Hammer Field Steering
24  Committee and have entered into multiple agreements since 1993,

25

26      [2] The majority of the work at OHF focuses on a 78-acre parcel
27  known as "Area 1." (Weston Dec., ¶ 5.)  Area 1 was historically
   the location of the most intense industrial activity, both during
28  and after World War II.  (Id.)

3

including a 1993 Cost-Sharing Agreement containing an interim allocation of costs and specification of remedial tasks to be performed.[3] On October 4, 1994, Plaintiff, the United States, and the State Agencies entered into a Potentially Responsible Party Agreement for Old Hammer Field ("Cooperative Agreement") governing the performance of the investigation and response actions at the site. On the same date, DTSC issued an Imminent or Substantial Endangerment Order and Remedial Action Order for OHF to Rockwell International, a successor to NAA and one of Boeing's predecessors.

In May 2004, the State Agencies approved the Final Remedial Action Plan ("RAP") for OHF, which was a result of the Cooperative Agreement process. The RAP identified two primary contaminants of concern. First, a chlorinated volatile organic compound ("VOC") known as trichloroethene ("TCE"), which has been used as a degreaser and industrial solvent for many industrial activities. The TCE plume extends almost 12,000 feet long, up to 4,000 feet wide at points, and up to 300 feet deep at points. It is suspected to have originated from Area 1. Second, tetrachloroethene ("PCE"), another industrial solvent, is contained within the larger TCE plume. The RAP has five principal components: (1) the Water Supply Contingency Plan; (2) the operation and treatment of water from Well 70; (3) the treatment of the "source area; (4) installation of wells to prevent downgradient migration of contaminants; and (5)

---

[3] The Steering Committee retained consultant ERM West, Inc. to perform most of the remedial work at OHF. (White Dec., Doc. 45-3, ¶ 9.)

the operation and maintenance of the system.[4]

None of the parties is satisfied with the interim allocation of money each has paid over the years under the Cost-Sharing Agreement. Each believes it is entitled to reimbursement from the other parties. Nonetheless, until August 2006, the cleanup had continued without interruption with funding from the parties identified in a series of amendments to the original Cost-Sharing Agreement. In early 2006, disputes about funding arose and while alternative proposals were discussed, the parties were unable to agree on the allocation of funds. With funding exhausted, in August 2006 the parties notified the State Agencies that the remediation work at OHF would stop because of funding disagreements.

In September 2006, DTSC determined Plaintiff and the United States were non-compliant with the Cooperative Agreement and that Boeing was non-compliant with the DTSC's October 1994 Order. On October 20, 2006, pursuant to the California Water Code, the RWQCB issued an order to all of the parties to comply with a groundwater monitoring and discharging program. On October 31, 2006, pursuant to the California Health and Safety Code, DTSC issued an Imminent or Substantial Endangerment Determination and Order and Remedial Action Order to all the parties to conduct various response actions in accordance with a specific timeline. The DTSC Order required all parties, unilaterally, jointly, and severally, to immediately

---

[4] The RAP originally included a sixth principal component, the "Pre-Design Investigation the Southeast Plume Source Area," but it was determined - based on a review of the samples - that the remediation systems were sufficient.

ensure that all required activities under the OHF RAP moved forward in accordance with the enforceable schedule.  In December 2006 the parties reached an agreement to fund the activities required by the State Agencies in their October 2006 orders in the form of Amendment 8 to the Cost-Sharing Agreement.

On November 2, 2006, Plaintiff filed this action seeking payment for response costs it has incurred in relation to the cleanup at OHF of contaminants released by Defendants.  The City sought a declaration of responsibility for past, present and future response costs incurred at OHF, as well as damages and injunctive relief to remediate the harm caused to OHF.  Plaintiff originally pled twelve causes of action: a) Claims One and Two against all Defendants for equitable contribution under CERCLA section 107(a) and section 113(f) contribution, respectively, b) Claim Three against all Defendants for contribution and indemnity pursuant to HSAA, Cal. Health and Safety Code § 25363(e) and treble damages under § 25398.17, c) Claim Four against all Defendants for injunctive relief and litigation costs pursuant to RCRA § 6972, d) state law claims against Boeing, Claims Five through Eleven, for continuing nuisance, public nuisance, negligence, negligence per se, continuing trespass, waste, and equitable indemnity and contribution, and e) Claim Twelve for declaratory relief, seeking a judicial determination of the parties' respective liabilities for the OHF cleanup.

On April 23, 2007, Defendant United States moved for partial judgment on the pleadings or partial summary judgment on Plaintiff's RCRA claim and for partial judgment on the pleadings as to the HSAA claim.  The City opposed the motion and the parties

appeared before the Court on December 3, 2007 for oral argument on Defendant's motions.   The case was subsequently stayed pending settlement negotiations.   On April 17, 2009, the stay was lifted and Plaintiff was ordered to file an amended complaint.   (Doc. 122.)

Plaintiff filed a Second Amended Complaint on May 18, 2009, advancing twelve causes of action, including claims under RCRA and HSAA.   (Doc. 123-3.)   Defendant United States filed a "Notice of Renewal of Pending Dispositive Motions" on August 7, 2009.   The unopposed motion was granted on August 12, 2009.

On August 20, 2009, the United States renoticed its motion for partial judgment on the pleadings or partial summary judgment on Plaintiff's RCRA claim:

> This motion will be based on this Notice of Motion and Motion, the Statement of Undisputed Material Facts, the Memorandum of Points and Authorities, the Declaration of Linda J. White, the Declaration of Rick Weston, and accompanying exhibits, all of which have been previously filed [on April 23, 2007], all the papers and pleadings on file in this matter, and on such argument of counsel and additional evidence as may be considered at the hearing.
>
> The previously filed Memorandum of Points and Authorities contains arguments and references relating to the First Amended Complaint. Such arguments and references are equally applicable to the Second Amended Complaint, filed June 9, 2009, which contains allegations that, in all respects material to this motion, are identical to the corresponding allegations of the First Amended Complaint.

(Doc. 142.[5])

The City opposed the United States' motions on September 14,

---

[5] The United States also incorporates its earlier filings in conjunction with its motion for partial judgment on the pleadings on Plaintiff's HSAA claim.   (Doc. 143.)

2009.[6]   In connection with its opposition, the City has filed a number of exhibits and declarations, including the declaration of Lisa Decker, counsel for the City.

### III. <u>LEGAL STANDARD</u>

Defendant moves for partial judgment on the pleadings or partial summary judgment.  Judgment on the pleadings is appropriate if, assuming the truth of all material facts pled in the complaint, the moving party is nonetheless entitled to judgment as a matter of law.  *Hal Roach Studios v. Richard Feiner & Co., Inc.*, 896 F.2d 1542 (9th Cir. 1989).  Under Rule 12(c), if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."  *MetroPCS, Inc. V. City and County of San Francisco*, 400 F.3d 715, 720 (9th Cir. 2005).  Here, the United States provides two declarations with numerous supporting documents as evidence in support of its RCRA arguments.  Because Defendant relies on matters outside the pleadings, its RCRA motion cannot be resolved under Rule 12(c).  Accordingly, the RCRA motion is treated as a motion for summary judgment.  The United States, however, does not rely on matters outside the pleadings to support its HSAA motion, therefore it is analyzed under Rule 12(c).

### A.   <u>Summary Judgment</u>

---

[6] Similar to Defendant, the City "incorporates in their entirety the points and arguments raised in its Opposition to the United States' Motions filed [] on May 7, 2007 and raised in oral argument on December 3, 2007."  (Doc. 150, 1:27-2:2.)  The City also filed supplemental oppositions.  (Docs. 150 & 151.)

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir. 2007).   With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v.*

*Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).  "[A] non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *Id*. (emphasis in original).  "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute exists, a district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

### B.    Judgment on the Pleadings

A party may move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial.  Fed. R. Civ. P. 12(c).  When a Rule 12(c) motion challenges the sufficiency of the pleadings, the standard for such a motion is similar to the standard for a Rule 12(b)(6) motion in that judgment on the pleadings is appropriate when, even if all the allegations in the complaint are true, the moving party is entitled to judgment as a matter of law. Milne ex rel. *Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042 (9th Cir. 2005).  In such cases, the court assumes the allegations in the complaint are true and construes those allegations in the light most favorable to the plaintiff. *McGlinchey v. Shell Chemical Co.*, 845 F.2d 802, 810 (9th Cir. 1988).  Conclusory allegations, however, without more are insufficient to defeat a Rule 12(c) motion. *Id*.

1

### IV.   DISCUSSION

The United States seeks judgment on two of the claims contained in the SAC.   First, the United States seeks summary judgment on Plaintiff's fourth claim under RCRA.   Second, the United States seek judgment on the pleadings on Plaintiff's third claim under the HSAA.

### A.   Preliminary Issues

#### 1.   *Declaration of Robert Dworkin*

To support the substance of its RCRA arguments, particularly those relating to "mootness," the City contends that at an August 2009 deposition, Mr. Robert Dworkin, a FUDS Program Manager, acknowledged that the Corps had not requested funding for the OHF cleanup in its 2009-2010 budget.   According to the City, "[g]iven that the point of the City's RCRA claim is to require the United States to actually fund its commitment to clean up OHF," the RCRA claim cannot be moot in light of the United States' testimony.

In response, the United States submitted the sworn declaration of Robert J. Dworkin, which clarified his August 2009 remarks:

> During my deposition in this action on August 27,2009, I testified that, at that time, the Corps had not budgeted any funds for the remediation of Old Hammer Field for Fiscal Year 2010, which extends from October 1,2009 through September 30, 2010. I testified that the budgeting process was not yet completed and that there was still an opportunity for FUDS to be budgeted for the Old Hammer Field cleanup.
>
> After the deposition, and despite Plaintiffs previous withdrawal from settlement negotiations, it was requested and the Corps agreed to reprogram, from FUDS that had been assigned to other remediation projects, approximately $300,000 that will be made available in increments of approximately $100,000 per quarter for the first three quarters of Fiscal Year 2010.   It is the Corps' understanding that this will cover the

11

> **Agency's share of expenses under the terms of the previous cost share agreement for the coming year.**
>
> **The funding described above will be made available subject to normal restrictions on federal agency funding such as the Anti-Deficiency Act. It should also be noted that the Department of Defense and the U.S. Army Corps of Engineers are currently operating under a Continuing Resolution Act at the moment which severely constrains DOD funds until such time as the Federal Government completes the DOD appropriations process for Fiscal Year 2010.**

**(Doc. 167-2, Dworkin Dec., ¶'s 3-5.)**

**Mr. Dworkin's sworn declaration resolves many of the arguments raised in the City's motion, particularly as they relate to funding for the Corps' 2009-2010 budget.[7]**

### 2. *Current Status of Cleanup*

**The OHF is the subject of ongoing remediation efforts. In 1994, the City, the United States, and Boeing signed a cooperative agreement outlining the investigation, cleanup, and response actions at the OHF site. In 2004, the stage agencies approved the final RAP for the OHF site. In October 2006, following a dispute among the parties, the DTSC issued an "Imminent or Substantial Endangerment Determination and Order" requiring all parties to unilaterally, jointly, and severally conduct all required activities in accordance with an enforceable schedule. In December 2006 the parties reached an agreement to fund the remediation activities required by the DTSC's October 2006 order in the form of**

---

[7] The history of funding of the OHF cleanup is that budgeting and approval of the annual cleanup costs is not completed and paid until the end of the applicable year. The United States' share has been paid every year.

Amendment 8 to the Cost-Sharing Agreement.  As best understood, the remediation efforts are continuing under Amendment 8.

The declaration of Lisa Decker provides an update:

15.   Since briefing and argument on the United States' Motion in 2007, the City has continued to contribute to the clean up efforts.  The City has paid a total of $3,632,771 of $14,576,692 in clean up costs, or 25 percent of the costs thus far. The United States and Boeing have paid the remainder.

(Decker Dec., Doc. 152, ¶ 15.)

Although the parties are not satisfied with scope and duration of funding, particularly as to the federal budgeting process, there has not been a formal breach of the cooperative agreement.[8]

B.   RCRA (Claim IV)

The RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996) (citing *Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331-32 (1994)).  Its purpose is to minimize the present and future threat to human health and the environment, not effectuate the clean-up of toxic waste sites or allocate those costs.  42 U.S.C. § 6902(b); *Meghrig*, 516 U.S. at 483.  The RCRA provides for citizen suits to obtain a "mandatory

_____

[8]   At oral argument on March 22, 2010, the Court clarified: "And the Court does not understand there to be a current breach, although it is always the case that federal funding, the federal government more often than not operates under continuing resolutions.   There is always –- because of the nature of the federal FIFG [sic] and the budgeting process under the law, if you will, delay involved in the ultimate approval authority.   But there hasn't been one year that the funding hasn't been approved and paid."   (Reporter's Transcript ("RT"), March 22, 2010, 12:8-12:15.)

injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that 'restrains' a responsible party from further violating RCRA." *Id.* at 484.

Specifically, citizens can sue for injunctive relief to enforce RCRA's provisions:

> against any person, including the United States,... who has contributed or who is contributing to the past of present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

The SAC seeks an injunction compelling Defendants to "correct the violations, including, but not limited to, investigating, remediating, responding to, and removing the contamination released from OHF, and for other actions as may be necessary to remedy the violations committed by Defendants." (SAC ¶ 133.)

The United States contends that the City's RCRA claim fails for four reasons: (1) the court lacks subject matter jurisdiction over this claim pursuant to § 113(h) of CERCLA, (2) the claim is moot because the City is asking the court to engage in an idle act as the United States is in compliance with the remedial objectives of the DTSC pursuant to the RAP; (3) under the primary jurisdiction doctrine, the administrative forum provided by the State of California is the appropriate forum for resolution of the City's claims concerning the cleanup of the OHF; and (4) there is no imminent and substantial endangerment at OHF as required by the RCRA framework.

Plaintiff rejoins that a number of factual developments

14

preclude summary judgment, chief among them that "the City has now determined that [...] TCP has leached into the City's water supply from OHF." (Doc. 150, 2:7-2:10.)  According to the City, because the current remediation efforts do not address TCP, each argument raised by the United States is unavailing.[9]  Even without the TCP allegations, the City argues that summary judgment is inappropriate because the United States has failed to obtain or commit sufficient funds to continue the cleanup at OHF.

The United States responds that the funding of the cleanup and the alleged introduction of TCP are irrelevant to the issues raised by its motion for three reasons.  One, absent a showing of "substantial and imminent danger to health or the environment," Plaintiff's TCP allegations have no legal effect.  Two, the DTSC has not ordered the parties to address TCP, therefore the United States is under no obligation to budget or spend money to remediate TCP from the OHF site.  Three, the fact that small amounts of TCP were allegedly detected in some city and county well "is irrelevant to whether the Court has subject matter jurisdiction over the RCRA claim."

### 1.   *CERCLA § 113(h)*

The substance of the United States' motion focuses on the jurisdictional bar contained in § 113(h) of CERCLA.  In 1986, Congress amended CERCLA to add § 113(h) which bars federal courts

---

[9] A general background of TCP, as well as its alleged existence at or near OHF, is set forth in the declaration of Lisa Decker, counsel for the City of Fresno. (Decker Dec., Doc. 152, ¶'s 3-13.)

15

from exercising jurisdiction over "any challenges" to removal or remedial environmental response actions taken pursuant to section 9604 of CERCLA, 46 U.S.C. § 104, while those response actions are ongoing. *McClellan Ecological Seepage Situation ("MESS") v. Perry*, 47 F.3d 325, 330 (9th Cir. 1995). The provision reads:

> No Federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action selected under [CERCLA § 104], of this title, or to review any order issued under [CERCLA § 106].

42 U.S.C. § 9613(h).

Congress passed this section in order to protect "the execution of a CERCLA plan during its pendency from lawsuits that might interfere with the expeditious cleanup effort." *McClellan*, 47 F.3d at 329. Section 113(h) amounts to a "blunt withdrawal" of jurisdiction from any challenges to a CERCLA cleanup. *Id*. The Ninth Circuit has held that a lawsuit qualifies as a "challenge" under § 113(h), and is thus barred, if it is "directly related to the goals of the cleanup itself." *Id*.

The parties dispute whether the OHF clean up proceeds under the authority of § 104.[10] The United States argues that the cleanup proceeds "pursuant to the CERCLA § 104 authority granted to it by the President in Executive Order 12,580 and under the DERP statute." According to the United States, this is an easy case: the OHF cleanup is a § 104 cleanup at a formerly owned defense

---

[10] Section 104 of CERCLA authorizes the President, in response to a release or threatened release of a hazardous substance, to "remove [the substance] or [...] provide for remedial action [...] or take any other response measure consistent with the national contingency plan [...] to protect the public health or welfare or the environment." 42 U.S.C. § 9604(a)(1).

site, nothing else.  Plaintiff argues that the cleanup is being undertaken pursuant to the authority of § 120 of CERCLA, 46 U.S.C. § 9620, and therefore is properly categorized as a § 120 clean up. Section 120 contains provisions applicable to cleanups on currently owned federal facilities and does not trigger § 113(h)'s jurisdictional bar.

Relying on *Fort Ord Toxics Project, Inc. v. California EPA,* 189 F.3d 828 (9th Cir. 1999), the City contends that the remediation activities at OHF are proceeding pursuant to § 120, not § 104.  The City, however, ignores *Fort Ord's* direction that § 120 covers only federal facilities, not privately owned ones, and the statutory language of § 120 itself.[11]  *Fort Ord* held that it was "unclear whether the legislators who voted for 113(h) subjectively intended to allow immediate challenges to remedial actions at federal facilities even while disallowing such challenges at private facilities."  *Id*.  *Fort Ord* implies that challenges to remedial actions at private facilities - supposedly cleanups pursuant to § 104 - are barred by § 113(h).  Here, there is no dispute that OHF is privately owned by the City of Fresno and that the activities in question are "remedial activities."

The remediation work at OHF is also carried out under the Defense Environmental Restoration Program, a federal statute which authorizes the Department of Defense to conduct remediation activities on both currently owned DOD properties and formerly owned properties where the DOD was the owner, lessor, or possessor

---

[11]  Section 120's own terms apply to properties "owned or operated" by the federal government.  The title of the heading in the legislation for § 120 is "Federal facilities."

at the time of actions leading to contamination by hazardous substances.  As for formerly owned DOD properties, the DERP statute authorizes the Formerly Used Defense Sites ("FUDS") program at 10 U.S.C. § 2701(c)(1)(B).  Both parties here acknowledge that the work at OHF is part of the FUDS program.

Plaintiff argues that the Defense Environmental Restoration Program statute makes activities carried out under the statute subject to § 120 of CERCLA.  It cites the DERP statute at 10 U.S.C. § 2701(a)(2) that program activities "shall be carried out subject to, and in a manner consistent with, section 120 (relating to Federal facilities) of CERCLA."  Plaintiff cites this section to support its argument that the FUDS program operates under CERCLA § 120.  Such an interpretation ignores the plain language of the section, which specifically references § 120 as relating to federal facilities in parentheses.  Because the statute applies to both currently and formerly owned federal facilities, the statute directing DERP activities at federal facilities should be implemented in a manner consistent with CERCLA § 120 activities, which also apply at federal facilities.  According to Plaintiff's argument, the DERP statute mandates that all its authorized activities be carried out under § 120, even those under FUDS that do not take place on federally owned properties.  This makes little sense given that § 120 applies only to federal properties.

The United States also references the language in the cooperative agreement to support its contention that cleanup is performed pursuant to § 104.  The cooperative agreement was discussed in detail by United States' counsel at oral argument on December 3, 2007:

18

1   What's on the screen now is a page from what's known
    as the cooperative agreement.  This is the agreement
2   between the plaintiff, the United States, and the
    State of California about how the cleanup was going to
3   be done, basically.  That's the simple version.

4   And if we look under the heading of jurisdiction on
    page 5 of that agreement, we see that the -- it says
5   that the National Guard Bureau and the U.S. Army Corps
    of Engineers enter into this agreement pursuant to
6   CERCLA/SARA, the NCP, that's the National Contingency
    Plan required by CERCLA and promulgated by the EPA,
7   Executive Order 12580 and DERP.

8   And Your Honor, this is the same line of authority
    that's stemming from Section 104(a).  Nothing -- no
9   reference to Section 120.  Of course, that wouldn't
    make sense to have a formerly used defense site
10  cleaned up under Section 120.

11  I'd like to direct your attention to another reference
    in this agreement, Your Honor, on page 10, what's been
12  marked as paragraph (A)(I) [...] [t]his definition of
    the term USACE means the U.S. Army Corps of Engineers
13  and also notes that it relates to the formerly used
    defense site, FUDS component of DERP, the Defense
14  Environmental Restoration Program.

15  It's apparent that this cleanup was going to involve
    a FUDS/DERP cleanup, and that again relates to Section
16  104(a) and Executive Order 12580 and not Section 120
    [...]
17
    One final reference to the cooperative agreement, page
18  31.  Under the heading of "Removal Action," I'm not
    going to read this, but on paragraph B, basically it's
19  the same legal authority [discussed preciously] and
    subsection (c) even contains a reference to Section
20  104.

21  Now this confirms what we've already seen in the other
    provisions of the agreement, and if this was a Section
22  120 cleanup, they would have been written much
    differently, and certainly the Section 104 reference
23  wouldn't even be there.

24
    (Reporter's Transcript, December 3, 2007, 11:18-12:19, 13:23-14:6).
25
26      In rebuttal, the City emphasizes that the Court should give
27  great weight to recent factual developments "relating to activities
28  and operations conducted on currently owned federal facilities

**19**

causing the contamination at issue that is triggering remediation activities." This argument incorporates the United States' current operations at AVCRAD and CANG, which are on/near the OHF. However, neither AVCRAD nor CANG is involved in any aspect of the OHF cleanup:

> Counsel:   Now, when this agreement was signed, the National Guard had agreed to cleanup certain of its own currently owned federal property. Now that was pursuant to Section 120, that there were two federal areas that the guard was cleaning up.
>
> Court:     Not the Old Hammer Field.
>
> Counsel:   In the area of Old Hammer Field [...] [however] the current cleanup doesn't involve these properties at all. That's the -- the currently owned federal property is not involved in the cleanup.
>
> But it shows -- if we take that paragraph 6.3 on page 11 [of the cooperative agreement], it shows that the parties knew how to reference Section 120 when 120 was appropriate. It says that the National Guard are federal facilities under jurisdiction of the Secretary of Defense within the meaning of CERCLA Section 120 and SARA Section 211.
>
> In contrast, the formerly owned, not the currently federal facility property, but the former federal facility property is set out in Section 6.6 [of the cooperative agreement]. Old Hammer Field is a formerly used defense site, FUDS, and is subject to the Defense Environmental Restoration program.
>
> Now, this case only involves Old Hammer Field. There is no cleanup that the state has ordered on federal property. The National Guard has done that on its own property. It's not part of the case. And it's clear that the property at issue here was and is being cleaned up pursuant to DERPS and FUDS, and the authority for that comes from Section 104(a) as delegated through Executive Order 12580.

(RT, December 3, 2007, 12:20-13:22.)

1     Here, the City's arguments that "[t]here is no proof that the

2   investigation and remediation activities at OHF are proceeding

3   under the direction of the Department of Defense pursuant to

4   Section 104 of CERCLA," are contradicted by the record.   All

5   remediation efforts are taking place on City-owned property; the

6   cleanup is proceeding under E.O. 12580 and the DERP statute,

7   implicating § 104, not § 120.   Moreover, while the United States

8   adequately explains the "consistent with § 120" issue, the City

9   does not explain why the cooperative agreement cites E.O. 12580 and

10  the DERP statute.   In particular, the City does not address this

11  question: why would the cooperative agreement cite E.O. 12580 and

12  the DERP statute if the cleanup was to proceed pursuant to § 120?

13    At oral argument on March 22, 2010, the City again stressed

14  the importance of the United States' admissions concerning its

15  operation of the AVCRAD and CANG facilities at or near the OHF.

16  According to Plaintiff, these admissions clearly demonstrate the

17  cleanup is proceeding pursuant to § 120, not § 104:

18          [The United States] admit[s] in their briefs, on this
            very issue, that those [properties] are subject to
19          CERCLA section 120.  If you look at the United States'
            initial motion [...] if you look at the cooperative
20          agreement, section 5.1(k) [...] it all discusses
            section 120 authority applying to the currently
21          operated federal facilities [...]

22          And the critical issue, again, is that the United
            States admits that they are a federally - that they
23          are operating pursuant to section 120, that they are
            a currently owned federal facility.  Same with AVCRAD.
24          And there's no dispute about that in the papers.

25
26  (Reporter's Transcript, March 22, 2010, 18:22-19:7, 21:11-21:16.)

27    Plaintiff's arguments are unpersuasive.  First, the undisputed

28  record points to a § 104 cleanup, not § 120.  Second, Plaintiff

overstates the United States' admissions concerning its AVCRAD and CANG operations.  In the documents cited by Plaintiff, the United States stated: "The Cooperative Agreement noted that there are only two areas that are currently under the jurisdiction, control, or custody of the U.S. Department of Defense: [CANG and AVCRAD].  These are the only portions subject to CERCLA Section 120.  None of the RAP-required cleanup activities will occur on these areas.  All of the remedial work will take place on property that is not owned or operated by the federal government."  (Doc. 45-2, pg. 14 at fn. 9.)   Contrary to Plaintiff's assertions, the government's admissions do not support its position.   If anything, the statements weaken it.[12]

The case law is also contrary to the City's position.  *Pollack v. U.S. Dep't of Defense*, 507 F.3d 522 (7th Cir. 2007) is most applicable.  There, the Seventh Circuit held that § 113(h) barred a lawsuit arising out of ongoing efforts to remediate an Illinois landfill located on property that used to be a U.S. Army base. *Pollack* reconciled Presidential authority under CERCLA, § 120, the National Priorities List, and the *Fort Ord* decision:

> Critically, § 120 does not provide a separate grant of authority for the President to initiate cleanups of federal sites or force private parties to do so. Hence a cleanup of a federally owned contaminated site must be initiated under §§ 104 or 106, just like the cleanup of a privately owned site.
>
> There is a wrinkle. Section 120 may create authority to clean up a certain type of federally owned property that does not include the landfill that is the subject of this lawsuit.  As noted above, the nastiest sites

---

[12] The language used to incorporate § 120 - for the AVCRAD and CANG cleanup - differs from the language used in the OHF-RAP and Cooperative Agreement to remediate the OHF.

in the country are listed on the National Priorities List and are to be cleaned up first thing. Section 120(e) requires the administrators of federal agencies that own property on this list to perform a remediation study and then to undertake any necessary remediation. Cleanup efforts of federal NPL Superfund sites therefore arguably are initiated under § 120, rather than §§ 104 or 106. But there is no dispute that the landfill on the former Fort Sheridan is not on the National Priorities List, so § 120 does not provide any authority for initiating a cleanup of it. Such authority comes solely from §§ 104 and 106, and so this challenge to the Fort Sheridan cleanup remains subject to the bar set out in § 113(h).

This explains the Ninth Circuit's decision in Fort Ord Toxics Project, Inc. v. California EPA, on which Pollack relies. [Fort Ord] held that a cleanup of a federally owned site was indeed initiated under § 120. Since § 113(h) only blocks challenges to cleanups initiated under §§ 104 or 106, the court ruled that the plaintiff's challenge was not subject to § 113(h) and could proceed. But the court noted that the property was listed on the NPL, and cited to § 120(e)'s grant of authority for cleaning such parcels. No other circuit has cited Fort Ord, but a district court confronting the same argument in the context of a non-NPL federal property – like Fort Sheridan in this case – concluded, correctly, we believe, that the cleanup was authorized by §§ 104 or 106 rather than § 120, and was therefore subject to § 113(h). The Ninth Circuit conceded that its Fort Ord decision was 'intuitively unappealing' and 'troubling.' We need not agree or disagree with that court's conclusion that cleanups to federally owned sites on the NPL are initiated under § 120 and hence not subject to the bar of § 113(h) because this case does not concern an NPL property.

*Id.* at 526 (citations omitted).

*Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d 1194 (N.D. Cal. 2005) is also instructive. In dismissing Plaintiff's RCRA claim for lack of subject matter jurisdiction, *Shea Homes* focused on whether the cleanup site was listed on the National Priorities List and whether there was EPA involvement:

Importantly, it was undisputed in Fort Ord that the clean up at issue was a remedial action being conducted by the EPA pursuant to the grant of

23

1    authority created by § 120.  The site at Ford Ord was
     placed by the EPA on the National Priorities List and
2    the clean up was conducted pursuant to EPA's delegated
     authority through an interagency agreement between the
3    EPA, the Army, and California state Agencies [...]

4    In this case, however, the site at issue is not
     included on the National Priorities List and the EPA
5    is not involved.  As a result, authority to undertake
     the clean up has been delegated to the Secretary of
6    Defense [pursuant to E.O. 12580 which delegates
     authority under § 104 to the Department of Defense]
7    [...]

8    As such [...] the response actions in this case were
     authorized by § 104 and thus are governed by § 113(h).
9

10   *Id*. at 1203 (citations omitted).

11        Applying *Pollack*, § 120 "merely supplements the existing

12   CERCLA regime by bringing federal property owners up to the same

13   standards as private owners; it does not create a separate system

14   for the feds."  *Id*. at 525.  Under *Pollack*, § 120 does not provide

15   a separate grant of authority beyond the facts of *Fort Ord*.[13]

16   Assuming, *arguendo*, that AVCRAD and/or CANG changes the OHF to a

17   "currently operated federal facility," the OHF would still be

18   characterized as a "non-NPL federal property," not being remediated

19   by the EPA, similar to *Pollack* and *Shea Homes* (two § 104 cases).

20   This line of authority does not support the City's position.  Here,

21   the OHF is properly classified as a "non-NPL non-federal property,"

22   which on the spectrum of 113(h) cases is one degree from *Pollack*

23   and *Shea Homes* (non-NPL federal property) and two degrees from *Fort*

24

25

26        [13]  Whether § 120 provides a separate grant of authority for
     the President to initiate cleanups of federal sites beyond the
27   facts of *Fort Ord* need not be resolved here.  It is enough to note
     the Seventh Circuit's analysis in *Pollack*, distinguish the facts of
28   *Fort Ord*, and discuss the case law applying § 104 and § 120.

                                   **24**

*Ord* (NPL federal property).[14]

The City relies on *City of Moses Lake v. United States*, 416 F. Supp. 2d 1015 (E.D. Wash. 2005), for the proposition that the "physical 'location' of the remediation activities is immaterial to the analysis of whether contamination from a federal facility is driving the remediation." This is the City's best argument. *Moses Lake* held that the proposed plan was not a § 104 "removal" action, but a § 120 "remedial action," therefore Plaintiff was not jurisdictionally barred from seeking a preliminary injunction. *Id*. However, *Moses Lake* is distinguishable on a number of grounds, namely that it was decided on a motion for preliminary injunction, involved a "plan for proposed remediation" not ongoing remediation, a prior agreement specifically referenced § 120's authority, the cleanup site was listed on the NPL, and there was EPA involvement:

> In October 1992, the EPA placed the former LAFB on the National Priorities List. And in 1999, the Department of the Army entered into an interagency agreement with the EPA concerning the preparation and performance of the RI/FS (Remedial Investigation/Feasibility Study) for the Moses Lake Wellfield Contamination Site. The IAG specifically states that the EPA and the Army enter into "this Agreement pursuant to their respective authorities contained in Sections 101, 104, 107, 120 and 122" of CERCLA [...]
>
> The EPA and the USACE are hereby PRELIMINARILY ENJOINED from formally issuing the proposed plan pending further order of this court. Within ten (10) days of the date of this order, EPA and the USACE shall make the proposed plan available to counsel for Moses Lake and all "relevant" Moses Lake officials involved in decision-making with regard to the Moses Lake Wellfield Contamination Site [...]

*Id*. at 1021, 1027.

---

[14] Like *Shea Homes*, the OHF is not listed on the NPL and the EPA is not involved with the current cleanup.

1   **The City fails to reconcile the relevant case law, including**
2   ***Pollack*, *Shea Homes*, *Moses Lake*, and *OSI, Inc. v. United States*,**
3   **525 F.3d 1294 (11th Cir. 2008).[15]   They involved materially**
4   **different issues from the one in this case.   *Pollack*, *Shea Homes***
5   **and *OSI, Inc.* dealt with whether 113(h)'s jurisdictional bar**

7   [15] *OSI, Inc. v. United States*, 525 F.3d 1294 (11th Cir. 2008)
8   is also instructive:

9   While [§ 120's] discussion of federal facilities is
10  extensive, we have searched the language of the section
    in vain for a general authorization for the federal
11  government to engage in remedial actions on federal
    facilities.   The only language approaching such a grant
12  of authority is in [§ 120(e)], which, as stated above,
    says a department "shall" engage in remedial
13  investigation and action, but only after the site has
    been included on the NPL. Section [§ 120] contains no
14  language authorizing any remedial activity if the site is
    not listed on the NPL.   It is undisputed that the OU-1
15  site has not been placed on the NPL.   The only language
    authorizing remedial actions on such sites is found in [§
16  104], the language of which is broad enough to be read as
    an authorization for all remedial actions, regardless of
17  the land upon which the action takes place.   Therefore,
    we hold the Air Force's remedial action for OU-1, a
18  federal facility not listed on the NPL, was "selected
    under"[§ 104] and is subject to the jurisdictional bar of
19  [§ 113(h)] [...]

21  Our view of [§ 113(h)] for federal facilities not listed
    on the NPL comports with the view of the Seventh Circuit.
22  The only other Circuit to address the jurisdictional bar
    for federal facilities and the source of authority for
23  remedial actions is the Ninth Circuit in Fort Ord [...]
    which held challenges to federal site cleanups were not
24  subject to [§ 113(h)'s] jurisdictional bar. As the court
    in Pollack noted, however, Fort Ord is distinguishable
25  because there the federal facility was listed on the NPL.
    Where a federal facility is not listed on the NPL, the
26  only language authorizing remedial or removal actions is
    found in § 104.

28  (*Id.* at 1298-99.)

**26**

applied to federal facilities that were not listed on the NPL
and/or did not involve the EPA.   Conversely, *Fort Ord* and *Moses
Lake* dealt with a federal facility that *was* listed on the NPL and
involved the EPA.   The OHF is a non-NPL non-federal property with
no EPA involvement.[16]

The same reasoning applies to the City's most recent argument
concerning TCP contamination.   The City argues that because the
"current State-approved remedial action plan for OHF does not yet
address TCP, [thus] there can be no challenge to it that would
implicate Section 113(h)."   Applying the City's reasoning, anytime
a new contaminant is *alleged* to be released on or near a current
cleanup site - even if that site is privately owned and cleanup is
proceeding under E.O. 12580 and/or DERP - § 113's jurisdictional
bar is inapplicable.[17]   This not only would lead to an illogical
result, but also conflicts with the stated purpose of § 113(h).

The City's arguments raise questions concerning how the
ongoing remediation of a formerly owned federal property is
impacted by the alleged discovery of a new contaminant.   The City,
however, does not bring its TCP allegations and AVCRAD/CANG
arguments within the authority of § 120.   The argument is weakened

---

[16] *Fort Ord* is factually distinguishable as the lawsuit
concerned contamination on federally owned property - an Army base
- and "[i]n February 1990, Fort Ord was placed on the Environmental
Protection Agency's National Priorities List."

[17] The City offers no legal support for its theory.   In
addition, on these facts, introduction and remediation of a new
contaminant at the OHF site would necessarily involve the DTSC and
RWQCB, as well as a "substantial and imminent" danger finding under
the RCRA framework.   The City does not develop these arguments as
they relate to § 113(h)'s jurisdictional bar.

by the City's request to "solely enforce the existing orders from DTSC and RWQCB," that do not discuss TCP or concern AVCRAD/CANG. The relevant case law, including *Fort Ord*, *Pollack*, *Shea Homes*, *Moses Lake*, and *OSI, Inc*., distinguishes the City's argument.

Here, all the evidence points to the applicability of § 104: the language of the cooperative agreement; OHF is privately owned by the City of Fresno; OHF is not listed on the NPL; the EPA is not involved in the cleanup of OHF; and neither AVCRAD nor CANG is involved in any aspect of the OHF cleanup. Nor does the City explain the specific inclusion of E.O. 12580 and DERP in the cooperative agreement (as opposed to the language re: the authority of § 120 to cleanup AVCRAD and KANG). The City's evidence is insufficient to create a genuine dispute of material fact that CERCLA § 120 applies to the OHF cleanup and not § 104.

### a.    *Is There a Challenge under § 113(h)?*

The City contends that even if the cleanup efforts at the OHF site are proceeding under § 104, the complaint is not a "challenge" to a cleanup plan that removes jurisdiction. The United States responds that the City's RCRA cause of action constitutes such a challenge while the City contends that it does not. The City claims that it is not attempting to challenge the cleanup because of "the presence of TCP in the groundwater." The proposed order and SAC, however, show that the City requests compliance with RCRA as well as to enforce the terms of the cooperative agreements and DTSC orders.

The City's arguments have been rejected by the Ninth Circuit in *McClellan Ecological Seepage Situation ("MESS") v. Perry*, 47

28

1    F.3d 325 and *Razore v. Tulalip Tribes*, 66 F.3d 236 (9th Cir. 1995).

2    In *MESS v. Perry*, the Ninth Circuit took a broad view of the scope

3    of § 113(h).   There, the plaintiffs made an argument similar to

4    that advanced here: that their RCRA claim was not a "challenge"

5    under § 113(h) because it was not attempting to delay or modify the

6    remedy, but rather only sought to compel the defendant's compliance

7    with RCRA's requirements.  *Id*. at 330-31.   The Court held that

8    while tangentially related claims, such as those to enforce minimum

9    wage requirements, do not constitute a challenge under § 113(h),

10   the plaintiffs' claim was "far more directly related to the goals

11   of the cleanup itself."  *Id*. at 330.  The Court also concluded that

12   for "all practical purposes" the plaintiffs were effectively

13   seeking to "improve" the clean up.  *Id*. As such, it found that the

14   plaintiff's claim was a "challenge" barred by § 113(h).  *Id*.

15       *Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d

16   1194, is also instructive.  Citing *McClellan*, *Shea Homes* held that

17   the plaintiff's RCRA claim was related to the cleanup's goals and

18   would interfere with the ongoing cleanup efforts:

19              Here, [Plaintiff] also argues that it is merely
20              seeking to enforce Defendant's compliance with
                applicable state laws and requirements.  It is
21              apparent, however, that it has a different view of
                what state law requires than does Defendant; otherwise
                it would have no purpose in seeking injunctive relief.
22              Indeed, Plaintiff alleges that the Corps' response has
                not adequately contained or controlled the migration
23              of landfill gas and that it should be 'enjoined to
                abate the migration.' Plaintiff also contends, as
24              noted above, that the Corps has made improper choices
                with respect to the timing of certain elements of the
25              remedy.  As such, the Court concludes that Plaintiff
                effectively seeks injunctive relief to "improve" the
26              on-going clean up.  As such, Plaintiff's RCRA claim is
                plainly related to the goals of the clean up–and would
27              likely require some interference with on-going clean
                up plans.  Accordingly, the RCRA claim constitutes a
28              "challenge" for purposes of § 113(h), and must

                                    29

therefore be dismissed for lack of jurisdiction.

Id. at 1204 (citations omitted).

The City argues that it is "solely seeking to enforce the existing orders from DTSC and RWQCB, not to second-guess or change them."  The City further argues that a genuine dispute of fact exists because "the current State-approved remedial action plan for OHF does not yet address TCP."  It is unclear, however, how TCP is related to the proposed injunction relief - the proposed order does not address TCP contamination.  Here, the City's request to enforce the existing DTSC and RWQCB orders - and their provisions to divide the remediation into discrete tasks - constitutes a "challenge" under *McClellan* and *Shea Homes,* as well as other Ninth Circuit authority.  *See, e.g.*, *Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469, 1482 (9th Cir. 1995) ("We held in *Razore v. Tulalip Tribes*, that '[a]n action constitutes a challenge if it is related to the goals of the cleanup.'").

The City's fourth claim under RCRA is DISMISSED WITH PREJUDICE for lack of subject matter jurisdiction pursuant to § 113(h) of CERCLA.

2.    *Imminent and Substantial Finding, Mootness, Primary JX*

Because Defendant's summary judgment motion is barred by § 113(h) of CERCLA, it is unnecessary to resolve the issues concerning mootness, the primary jurisdiction doctrine, and whether the City has satisfied RCRA's "imminent and substantial

30

endangerment" requirement.[18]

Assuming, *arguendo*, that § 113(h) does not bar the City's RCRA claim, it is unclear how the City demonstrates "credible evidence" to suggest than the current levels of TCP contamination create an imminent or substantial endangerment to health or the environment exists at or near the OHF.[19]  Moreover, the State of California,

---

[18] Under the doctrine of primary jurisdiction, when certain issues or forms of requested relief require the resolution of matters that fall "beyond the conventional experience of judges" or are "within the realm of [...] an administrative agency with more specialized experience, expertise, and insight [than the judiciary]," a court may either stay the action until the agency has considered the issue, or may dismiss the claims altogether. *United States v. Gabelli*, 345 F. Supp. 2d 340, 350-51 (S.D.N.Y. 2004).   This judicially created doctrine serves two primary interests. First, it allows the resolution of "technical questions of fact through an agency's specialized expertise prior to judicial consideration of the legal claims." Second, such deference ensures "consistency and uniformity in the regulation of an area" entrusted to an agency by the legislature through a regulatory scheme.  *Id*.

[19] RCRA provides for citizen suits "against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).  Under this section, "[a]n endangerment can only be 'imminent' if it 'threatens to occur immediately.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) (quoting Webster's New International Dictionary of English Language 1245 (2d ed.1934)). "[T]his language 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'"  *Id.* (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)).  To show an "imminent and substantial" threat, the plaintiff must do more than establish the presence of solid or hazardous wastes at a site.  *Foster v. United States*, 922 F.Supp. 642, 661 (D.D.C. 1996).  Instead, "endangerment must [be shown to] be substantial or serious, and there must be some necessity for the action."  *Price*, 39 F.3d at 1019.  The fact that remedial activity in accordance with CERCLA has commenced at a site greatly reduces the likelihood that a threat to health or the environment is imminent. *Christie-Spencer Corp. v. Hausman Realty*

31

through the DTSC and RWQCB, has oversight over the remediation and has the scientific understanding and resources necessary to investigate and remediate alleged hazards.  Conversely, the district court has neither the resources nor expertise necessary to properly address the scientific issues presented by an alleged imminent and substantial endangerment to health or the environment.

These concerns are shared by a number of district courts throughout the United States.  *See West Coast Home Builders, Inc. v. Aventis Cropscience USA Inc*, No. 04-2225-SI, 2009 WL 2612380 (N.D. Cal. 2009) ("There are two fundamental problems with plaintiff's RCRA claim [...] [f]irst, the Consent Order already requires GBF/TRC to clean up the groundwater contamination, and that remediation has been underway for years [] Plaintiff seeks relief that it is already obtaining outside of this lawsuit."); *see also River Vill. W. LLC v. Peoples Gas Light and Coke Co.*, 618 F. Supp. 2d 847, 854-55 (N.D. Ill. 2008) ("Unlike the district court, the [agency] has been specifically charged with the responsibility to develop and enforce regulations to implement the environmental laws passed by Congress [...] the district court's handling of this matter would be delayed by years if research and discovery which would be necessary to develop a basic understanding of the [contamination area and hazards presented].");  *OSI, Inc. v. United States*, 510 F. Supp. 2d 531 (M.D. Ala. 2007) ("OSI has presented no [] evidence to suggest that an imminent or substantial endangerment to health or the environment exists on OSI or Government property.  Furthermore, the Government is conducting a

_____

*Co., Inc.*, 118 F. Supp. 2d 408, 419-23 (S.D.N.Y. 2000).

remediation program in conjunction with ADEM to repair any contamination and resulting dangers that do exist [...] [t]hese two factors together lead the Court to conclude that the Government is entitled to summary judgment."); *Davis Bros., Inc. v. Thornton Oil Co.*, 12 F. Supp. 2d 1333, 1338 (M.D. Ga. 1998) ("[P]laintiff has presented no credible evidence supporting a finding of imminent and substantial endangerment to health or the environment [...] [m]oreover, the proposed remedy of injunctive relief is moot because Conoco has already agreed to remediate the site and pay for any costs associated with the cleanup, and the state is overseeing the cleanup more effectively than the court ever could.  Thus, the RCRA claim fails on the merits, and is also moot.").  This language applies with equal force to this case.

### C.   HSAA CLAIM

The United States argues that the Court lacks subject matter jurisdiction to hear the HSAA claim because the United States has not waived sovereign immunity.  The City disagrees.

In enacting CERCLA, Congress "envisioned a partnership between various levels of government in addressing the complex and costly problems associated with hazardous waste remediation."  *Fireman's Fund Ins. Co. v. City of Lodi*, Cal., 302 F.3d 928, 940 (9th Cir. 2002).  CERCLA specifically anticipates states enacting legislation addressing environmental remediation.  *Id.* at 942.  In California, the Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA"), Cal. Health & Safety Code § 25300 *et seq.*, grants the DTSC authority to require the cleanup of sites within the state where chemical contamination represents a threat to human health or

the environment. *Id.* at 934. HSAA is the state law counterpart to CERCLA. *Foster-Gardner, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 18 Cal.4th 857, 865 (1998); *City of Lodi v. Randtron*, 118 Cal. App. 4th 337, 351 (2004). Under HSAA, DTSC oversees the cleanup of hazardous waste sites by issuing remedial orders and by entering into agreements with potentially responsible parties ("PRPs") to facilitate remediation efforts. *Fireman's Fund*, 302 F.3d at 934. Both the federal and state statutes are designed to: (1) achieve the complete and cost-effective cleanup of contaminated sites; and (2) provide a way to assign those costs to the parties responsible for the contamination. *Id.* at 945-46.

Under CERCLA, departments and agencies of the United States are subject to liability to the same extent as any non-governmental entity. *United States v. Shell Oil Co.*, 294 F.3d 1045, 1052-53 (9th Cir. 2002). Section 120(a)(1) explicitly waives the sovereign immunity of the United States with respect to CERCLA actions. *Id.* Regarding state laws governing hazardous waste response, § 120(a)(4) of the CERCLA statute addresses their application to the federal government:

> State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action *at facilities owned or operated by a department, agency, or instrumentality of the United States* ... when such facilities are not included on the National Priorities List. The preceding sentence shall not apply to the extent a State law would apply any standard or requirement to such facilities which is more stringent than the standards and requirements applicable to facilities which are not owned or operated by any such department, agency, or instrumentality.

42 U.S.C. § 9620(a)(4) (emphasis added).

The law regarding waivers of the sovereign immunity of the

United States is straightforward.  Absent an express waiver, "the activities of the federal government are free from regulation by any state."  *United States v. State of Wash.*, 872 F.2d 874, 877 (9th Cir. 1989) (quoting *Mayo v. United States*, 319 U.S. 441, 445 (1943).  Any waiver of United States sovereign immunity must be unequivocal; it cannot be implied.  *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992); *State of Wash.*, 872 F.2d at 877. Such a waiver "must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires."  *Ohio,* 503 U.S. at 615 (citations and quotations omitted).  Furthermore, only Congress can waive the sovereign immunity of the United States. *Cal. v. NRG Energy Inc.*, 391 F.3d 1011, 1023-24 (9th Cir. 2004); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir. 1998).  It must do so explicitly in statutory text.  *United States v. Nordic Village, Inc.*, 503 U.S. 30, 37 (1992) ("[t]he 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text.").

To determine whether the United States waived its sovereign immunity under § 120(a)(4), it is necessary to harmonize the arguments advanced by the parties in the original briefing with those raised in the renewed motion.  In 2007, the City argued CERCLA § 120(a)(4) includes both facilities currently owned or operated by the United States, as well as those that were formerly owned or operated, such as OHF. According to the City, because OHF was a "formerly operated facility," § 120(a)(4)'s waiver of sovereign immunity applies to OHF and the City's HSAA claim against the United States survives.  The City relied exclusively on *Tenaya Assoc. Ltd. P'ship v. United States Forest Serv.*, No. CV-F-92-5375

1  REC, 1995 WL 433290 (E.D. Cal. May 19, 1993) as the "law of this
2  district."

3      In *Tenaya,* the court found that the § 120(a)(4) waiver
4  included a waste site in Fish Camp, California that the United
5  States had formerly operated and owned.  *Tenaya* stated § 120(a)(4)
6  is "meant to include all actions brought against the United States
7  for harms which occur during a time when the United States owns or
8  operates a facility."  *Id.* at *2.  The court observed that this
9  interpretation preserved the present tense wording of the section
10 and provided a clear limit on the waiver of sovereign immunity in
11 that immunity was maintained for past harms that occurred before
12 the government owned or operated the facility.  *Id.*  Citing
13 surrounding CERCLA provisions in support of its conclusion, the
14 *Tenaya* court explained that § 120(a)(4) should be read in
15 conjunction with sections 120(a)(1) and section 107(a)(2), which
16 subject federal facilities to the full extent of CERCLA liability
17 and define who is liable, respectively.  *Id.* at *2-3.  This reading
18 avoided what the *Tenaya* court termed an illogical outcome, namely,
19 that if formerly owned or operated facilities were not included
20 then (1) the United States would be liable for all past harms as
21 long as it currently owned or operated a facility, regardless of
22 whether it created those harms, and (2) the government could avoid
23 liability by simply selling land that it contaminated before a
24 lawsuit was initiated.  *Id.* at *3.

25     *Tenaya* is not binding authority on another District court.
26 Nor is it accurate to say it is "the law of this district."
27 District court opinions are relevant for their persuasive authority
28 but they do not bind other district courts within the same

district.  *See, e.g., Hart v. Massanari*, 266 F.3d 1155, 1174 (9th Cir. 2001).  Second, the *Tenaya* opinion is not persuasive.  Every district court decision on this issue since has held that § 120(a)(4) only waives sovereign immunity for state law claims related to facilities currently owned or operated by the United States.  *See Steadfast Ins. Co. v. United States,* No. CV 06-4686-AHM-RZX (C.D. Cal. Feb. 6, 2007); *Gen. Motors Corp. v. Hirschfield Steel Serv. Ctr., Inc.*, 402 F. Supp. 2d 800, 804 (E.D. Mich. 2005); *Miami-Dade County v. United States,* 345 F. Supp. 2d 1319, 1354 (S.D. Fla. 2004); *Crowley Marine Servs., Inc. v. Fednav Ltd.*, 915 F.Supp. 218, 222 (E.D. Wash. 1995); *Rospatch Jessco Corp. v. Chrysler Corp.*, 829 F. Supp. 224, 227 (W.D. Mich. 1993).  In so holding these courts have emphasized that a waiver must be unequivocal and cannot be implied.  The facts and ruling in *Tenaya* are not helpful or persuasive in this case.

The arguments raised in the renewed motion are addressed in light of the majority view interpreting § 120(a)(4), i.e., *Tenaya*'s inapplicability.  Here, the substance of the United States' renewed motion mirrors that of its original motion: that none of the remediation is taking place on a federally owned facility, therefore § 120(a)'s waiver provisions do not apply.  The City, in contrast, now argues that the United States waived its sovereign immunity by operating AVCRAD and CANG facilities at OHF - making it a "current operator" -, a position developed during an exchange between the Court and the City's counsel on December 3, 2007:

Court:  So by the presence of the Air Guard, you say that this is a current federal facility that's in operation.

Counsel:  That is correct.  There are parts of it that are

currently in operation, and the National Guard Bureau is named in our complaint, it comes to all of the Old Hammer Field steering committee meetings.  There are issues relating to their use of the site.

The United States said that it pertains to a completely different issue.  He said that the currently owned federal properties are not involved in the cleanup.  That is absolutely not the case.  There is PCE that has been released from the KANG parcels that is part of this. Some of the releases from the KANG parcels have commingled with the plume that emanates from Area 1, which create issues in terms of what needs to be done to clean up.

And therefore, because you have a commingled waste plume, you can't necessarily say, you know, you can't really distinguish whose fault it is, and what cleanup is necessary because of what actions.

And, again, those are issues that will obviously develop for the Court as we move forward, but at this point there are issues of divisability [sic] and issues of who is responsible for what that aren't ripe for decision...

Court:     Are those facts in the complaint?

Counsel:   The facts that the Guard is currently operating?

Court:     Yes, and on-site?

Counsel:   I believe that those are in the complaint, and if it's not, that would be a simple matter to amend.

(Reporter's Tanscript ("RT"), December 3, 2007, 53:2-54:12.)

On June 9, 2009,[20] the City filed the operative second amended complaint, which included new/modified allegations that the United States is a "current operator" at OHF pursuant to its AVCRAD and KANG operations:

---

[20] The City's motion for leave to file the second amendment complaint was filed on May 23, 2009.  (Doc. 123.)  Leave was granted on June 9, 2009.  (Doc. 127.)

25.   The United States is both a part and current operator of OHF, and has operated at OHF from 1941 to the present [...]

32.   The California Army National Guard ("CANG") units, through the Transportation Aircraft Repair Shop ("TARS") and the Aviation Classification Repair Activity Depot ("AVCRAD"), whose interests are represented by the USACE, performed, among other activities, cleaning, stripping, repair, overhaul, maintenance, refurbishing and construction of helicopters and aircraft and associated parts at OHF on land and property leased from the City. As such, this Complaint hereafter refers to all activities conducted by CARNG, TARS, AVCRAD as though conducted by defendant USACE. USACE leased certain portions of the property and land on OHF at which it conducted its operations from the City between 1961 and at least 1987. USACE continued, since 1987 to the present, to lease certain portions of property and land at OHF at which it continued and continues to conduct its operations.

33.   During the time it leased property from the City, USACE, among other activities, modified aircraft and remanufactured aircraft parts for the United States in connection with the Korean war as well as other ongoing and general defense support activities.

34.   USACE leased various buildings and land from the City at OHF, conducting its primary operations in three locations at OHF, including in and around Hangar T-282 and Hangar P-3, the East Air Terminal Drive facility and the Airways Avenue locations, as well as surrounding buildings, and elsewhere on the leased land.

35.   In the course of its activities and operations, upon information and belief USACE has used, stored and released numerous chemicals, hazardous substances, wastes, materials, pollutants, and contaminants, including but not limited to PCE, TCE, and TCP at, under, adjacent to and downgradient of OHF that have negatively impacted the land, soil and ground water at, under, adjacent to and downgradient of OHF.

36.   In the course of its activities and operations at OHF, USACE has released and continues to release hazardous substances, wastes, materials, pollutants and contaminants into the ground water, soil and environment at OHF, including, but not limited to dumping and pouring waste TCE directly into the sewer system, which releases and continued threatened releases have caused the City to incur necessary response costs associated with OHF

39

consistent with the NCP in excess of the City's fair share of any such costs, as well as other damages.

37. The California Air National Guard ("CANG"), whose interests are represented by the NGB, has conducted and now conducts its operations and activities on land and property leased from the City. As such, this Complaint hereafter refers to all activities conducted by CANG as though conducted by defendant NGB. NGB leased the property and land on OHF at which it conducted and conducts its operations from the City between at least 1954 and the present.

39. In the course of its operations and activities at OHF, upon information and belief NGB has used, stored and released numerous chemicals, hazardous substances, wastes, materials, pollutants and contaminants, including but not limited to PCE, TCE and TCP, at, under, adjacent to and downgradient of OHF that have negatively impacted the land, soil and ground water at, under, adjacent to and downgradient of OHF.

40. NGB is a current owner of a federal facility at OHF.

41. In the course of its activities and operations at OHF, NGB has and continues to release hazardous substances, wastes, materials, pollutants and contaminants into the ground water, soil and environment at OHF, which releases and continued threatened releases have caused the City to incur necessary response costs associated with OHF consistent with the NCP in excess of the City's fair share of any such costs, as well as other damages [...]

52. Upon information and belief, other hazardous substances, wastes, contaminants, pollutants, and materials, including TCP, have also been identified as present in the soil and ground water at, under, adjacent to and downgradient of OHF [...]

124. The City has incurred, and will continue to incur, response costs, including costs of investigation, removal and/or remedial actions, in the investigation, clean up and abatement of the releases and threatened releases of hazardous substances from all of the Defendants' operations and activities at OHF, including but not limited to the continuing cost of implementing the OHF RAP, all pursuant to HSAA and CERCLA and therefore is entitled to contribution and indemnity from defendants, together with interest, under HSAA, Health and Safety Code § 25363(e).

(SAC, ¶'s 25, 32-37, 39-41, 52, 124.)

The City's new allegations raise the question of what effect the United States' operation of AVCRAD and CANG have on the issue of waiver under § 120(a)(4).  The United States argues that the operation has no effect because the actual remediation is taking place on land owned by the City, not federal property.  The United States also maintains that the property leased by the federal government  - AVCRAD and CANG - was remediated, therefore the City did not incur any response costs on federal property.  The City responds that it satisfies *Iqbal* because it "alleged in its SAC that the response costs were incurred at property that is currently owned or operated by the United States."

The United States is correct.  The City's primary argument fails on the specific facts of this case, as the OHF remediation is taking place on property owned by the City, not the federal government.  (See SAC, Doc. 123-3, ¶ 5 ("The City, which is involved solely because it owns the property the Defendants contaminated [....]" ; Doc. 123-3 at ¶ 38 ("[The United States] continues to lease property from the City [....]"); Doc. 123-3 at ¶ 55 ("The City was identified by the State as a PRP solely because of its ownership of the OHF property [....]")).  Moreover, the exhibits/maps attached to the SAC demonstrate that the remediation site is separate and distinct from AVCRAD and CANG, i.e., the alleged "current federal operations."[21]  (See Docs. 123-4 through

---

[21] Generally, to avoid converting a motion for judgment on the pleadings into a motion for summary judgment, the Court may only consider the face of the complaint.  See Fed. R. Civ. P. 12(c); *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).  However, the incorporation by reference doctrine allows the

123-6; Doc. 123-3, ¶ 34.)   The mere presence of the AVCRAD and CANG facilities - on the OHF airfield generally - does not transmute the *entire cleanup* into a remedial action at a "federally owned or controlled" facility;   such unaffiliated federal facilities are outside the scope of § 120(a)(4).[22]   The City does not sufficiently allege that there is a remedial action at a "facility" owned or operated by the federal government.[23]   *See Iqbal*, 129 S.Ct. at 1950

Court to consider any exhibits attached to the complaint as well as any documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). The Court may also "take judicial notice of matters of public record" and consider them without converting the motion into one for summary judgment. *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008).

[22] Specifically, the City alleges that "[t]he United States is both a past and current operator of OHF, and has operated at OHF from 1941 to the present." (Doc. 123-3, ¶ 25.) However, the City conflates two distinct definitions/operations: (1) federal operations/facilities, generally; and (2) removal or remedial actions *at "facilities owned or operated by a department, agency, or instrumentality of the United States."* 42 U.S.C. § 9620(a)(4) (emphasis added). Here, the City acknowledges that the United States does not own - or conduct operations - at the remediation site.   Instead, it alleges that the United States' adjacent operations - on the larger OHF airfield - constitute applicable "facilities" under § 9620(a)(4).

[23] *Robinson v. U.S. Cold Storage, Inc.*, No. 01-697-GMS, 2002 WL 187511 (D. Del. Feb. 5, 2002) is instructive:

> The waiver language in CERCLA is not sufficient to permit an exercise of jurisdiction over the U.S. Air Force under the facts in this case.   USCS's claim hinges on the fact that the U.S. Air Force crashed a plane on the cite in 1954. CERCLA, however, only waives immunity as to "facilities" owned by the United States.   The United States did not own the site in question.   Further, the court cannot conclude that the common meaning of facility encompasses an airplane that passed over the site and accidentally crashed

("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss [...] where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'shown'- that the pleader is entitled to relief.").

At oral argument on March 22, 2010, the City argued that the United States waived its sovereign immunity by signing the 1994 cooperative agreement.   The relevant portion of the Agreement provides:

> Potentially   Responsible   Party   Agreement   Under CERCLA/SARA, the NCP, California Health and Safety Code §§ 25355.5, 25353 and 25347.6.

(Doc. 45-6, pg. 7.)

The City relies on *Kaffenberger v. United States*, 314 F.3d 944 (8th Cir. 2003) for the proposition that the United States waived its   sovereign   immunity   because   the   cooperative   agreement incorporated the HSAA.

The City's argument is a nonstarter.   First, *Kaffenberger* is based on a tax law nuance: Congress, as the only branch able to waive the United States' sovereign immunity, provided a "mechanism that allows the IRS and taxpayer to extend the period for bringing suit to recover a refund beyond the normal two-year statutory

_____

> there.   Moreover, since the plane no longer exists, the court refuses to find that it is a facility [...]
>
> Since the plane is neither a facility [...] the court finds that USCS has failed to allege facts that prove the U.S. Air Force has engaged in an activity that would cause the court to conclude that it has waived its sovereign immunity under CERCLA.

*Id.* at *3.

43

1  period." *Id.* at 952. *Kaffenberger* is distinguishable; there is no

2  such congressional action in this case.   Second, the City's

3  reasoning conflicts with the general rule that "only an express

4  statute may waive the sovereign immunity of the United States."

5  *Lion Raisins, Inc. v. United States*, 58 Fed. Cl. 391, 396 (Fed.Cl.

6  2003) (citation omitted).   These two factors together lead to the

7  conclusion that the United States did not waive its sovereign

8  immunity when it signed the cooperative agreement.

9       The City has failed to state facts sufficient to state a claim

10  under the HSAA.   A claim is plausible only "when the plaintiff

11  pleads factual content that allows the court to draw the reasonable

12  inference that the defendant is liable for the misconduct alleged."

13  *Iqbal*, 129 S.Ct. 1937, 1949 (quoting *Bell Atlantic Corp. v.

14  Twombly*, 550 U.S. 544, 570.).   The SAC's third cause of action

15  under the HSAA does not meet this standard*.   See In re Syntex Corp.

16  Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996) ("Conclusory

17  allegations and unwarranted inferences are insufficient to defeat

18  a motion for judgment on the pleadings.").   The United States'

19  motion is GRANTED.

20       The City's HSAA claim is based on the conclusory allegation

21  that the AVCRAD and CANG operations are "currently owned or

22  operated federal facilities," as defined by 42 U.S.C. § 9620(a)(4).

23  However, there are no facts alleged in the SAC which support such

24  a conclusion.   First, the remediation "facility" or "site" is owned

25  by the City of Fresno, not the federal government.   It is clear

26  from the SAC – and attached exhibits – that the remediation site is

27  only a portion of the larger OHF and is not located on the property

28  leased by the federal government (for its AVCRAD or CANG

1    operations).   **Second, it is/was impossible for the City to incur**

2    **response costs at either AVCRAD or CANG because the Corps**

3    **remediated both sites many years ago.**[24]  **For these reasons, the HSAA**

4    **claim is DISMISSED WITH PREJUDICE.**[25]

5    ///

6    ///

7    ///

8    ///

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ――――――――――――――

18   [24] The City alleges that it incurred response costs stemming
     from the "implement[ation] [of] the OHF RAP" and "in excess of the
19   City's fair share of any such costs."  As explained *supra*, however,
     the OHF cleanup involves City-owned property, not federally owned
20   or controlled facilities.  The government also notes that it is/was
     impossible for the City to incur response costs at either AVCRAD or
21   CANG because the Corps remediated both sites many years ago.

22   [25] For these reasons, any amendment to Plaintiff's HSAA claims
     would be futile.  *See generally Steckman v. Hart Brewing, Inc.*, 143
23   F.3d 1293, 1298 (9th Cir. 1998) ("Although there is a general rule
     that parties are allowed to amend their pleadings, it does not
24   extend to cases in which any amendment would be an exercise in
     futility, or where the amended complaint would also be subject to
25   dismissal ...." (citations omitted)).  Moreover, the City did not
     request leave to amend in either its original or renewed
26   opposition.  However, if the City now contends it can sustain a
     HSAA claim, it may file a motion under Rule 15(a) of the Federal
27   Rules of Civil Procedure.

28

**V.  CONCLUSION**

For the reasons stated:

(1)   The United States' motion for partial summary judgment on the City's RCRA claim is GRANTED; and

(2)   The United States' motion for partial judgment on the pleadings on the City's HSAA claim is GRANTED.


The United States shall submit a form of order consistent with, and within five (5) days following electronic service of, this memorandum decision.


IT IS SO ORDERED.

**Dated:    April 22, 2010**                    **/s/ Oliver W. Wanger**
                               UNITED STATES DISTRICT JUDGE

**46**