1
2
3
4
5

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

6
7

| | |
|---|---|
| **CITY OF FRESNO,** | **No. 1:06-CV-1559-OWW-GSA** |
| **Plaintiff,** | **MEMORANDUM DECISION RE: THE CITY OF FRESNO'S MOTION FOR RECONSIDERATION OF THE COURT'S APRIL 22, 2010 DISMISSAL OF THE CITY'S RCRA AND HSAA CLAIMS (Doc. 281)** |
| **v.** | |
| **UNITED STATES OF AMERICA, *et al.,*** | |
| **Defendants.** | |

## I.   INTRODUCTION.

Plaintiff City of Fresno brings this motion for reconsideration, pursuant to Federal Rule 59(e), of the April 22, 2010 Memorandum Decision, granting two motions filed by the United States: (1) for partial judgment on the pleadings or partial summary judgment as to Plaintiff's fourth claim under the RCRA; and (2) for partial judgment on the pleadings as to Plaintiff's third claim under the HSAA.  According to the City, the Court overlooked controlling authority and facts advanced in its opposition which establish a genuine issue of fact on whether CERCLA § 120 applies to the OHF cleanup, not § 104.  The City also moves for reconsideration on grounds that it uncovered "newly discovered evidence" concerning TCP.

1

1        II. **FACTUAL BACKGROUND**.

2    A.   **General Factual Background**

3    This case involves a cost recovery/contribution action under

4 CERCLA and related statutes, arising from the parties' continuing

5 efforts to investigate and clean up Old Hammer Field ("OHF") in

6 Northeast Fresno, a site presently occupied by the Fresno-Yosemite

7 International Airport ("FAT").[1]   Pursuant to an interim cost

8 sharing agreement dating back to 1993, the parties have funded the

9 cleanup and remediation of contamination at the OHF.  One of those

10 parties, the City, now claims that it has paid too much.

11   On November 2, 2006 the City commenced this civil action

12 against Defendants the Boeing Company ("Boeing"), the United States

13 of America, United States Army Corps of Engineers, and the National

14 Guard Bureau (collectively, the "United States").  (Doc. 1.)   In

15 March 2008, the action was stayed for a settlement reportedly

16 reached among the parties.  (Doc. 63.)  In March 2009, however, the

17 City raised new allegations in relating to a previously undisclosed

18 contaminant at OHF, 1,2,3-trichloropropane ("TCP").   In April of

19 2009 the stay was lifted.  (Doc. 122.)  The City filed the second

20 amended complaint on June 9, 2009 setting forth new allegations

21

22      [1] The State of California, through its Department of Toxic
23 Substances Control ("DTSC") and the Regional Water Quality Control
   Board ("RWQCB") ("State Agencies") has oversight over the cleanup.
24 *City of Fresno v. United States*, --- F. Supp. 2d ----, 2010 WL
   1662476 at 2 (E.D. Cal. 2010).  The parties work together as the
25 Old Hammer Field Steering Committee and have entered into multiple
   agreements since 1993, including a 1993 Cost-Sharing Agreement
26 containing an interim allocation of costs and specification of
   remedial tasks to be performed.  *Id*.   The Steering Committee
27 retained consultant ERM West, Inc. to perform the remedial work at
   OHF.  *Id*.
28

**2**

1   regarding the presence of TCP at OHF.   (Doc. 123-3.)

2

3        **B.   The April 22, 2010 Memorandum Decision**

4        On April 23, 2007, Defendant United States moved for partial

5   judgment on the pleadings or partial summary judgment on

6   Plaintiff's RCRA claim and for partial judgment on the pleadings as

7   to the HSAA claim.   The case was subsequently stayed pending

8   settlement negotiations.   On April 17, 2009, the stay was lifted

9   and Plaintiff was ordered to file an amended complaint.

10        Plaintiff filed a second amended complaint on May 18, 2009,

11   advancing twelve causes of action, including claims under CERCLA,

12   RCRA and the HSAA.[2]   Defendant United States filed a "Notice of

13   Renewal of Pending Dispositive Motions" on August 7, 2009.   The

14   unopposed motion was granted on August 12, 2009.

15        On August 20, 2009, the United States renoticed its motion for

16   summary adjudication on Plaintiff's RCRA and HSAA claims.[3]   The

17   City opposed the motion on September 14, 2009.   By Memorandum

18   Decision dated April 22, 2009, the Court determined that: (1) the

19   OHF cleanup is proceeding pursuant to § 104, not § 120, therefore

20   § 113(h) of CERCLA bars the City's RCRA claim; and (2) the City

21   failed to state facts sufficient to state a claim under the HSAA.

22        The City now moves for reconsideration of that decision,

23   arguing that the facts as pled demonstrate that its RCRA and HSAA

24   _____

25        [2] The City also advanced a number of state law theories,
     including trespass, nuisance, negligence, waste, and equitable
26   indemnity.   (Doc. 123-2 at ¶¶ 136-86.)

27        [3] The United States' original motion was filed on April 23,
     2007.   Oral argument was held on each round of briefing, the first
28   on December 3, 2007, the second on March 22, 2010.

claims must go forward.   The United States opposes the City's motion on its merits, but asserts that if reconsideration is granted, the City's claims are infirm for the alternative grounds originally argued in its motion.

### III. PROCEDURAL BACKGROUND.

On May 26, 2010, the City moved for reconsideration of the April 22, 2010 Memorandum Decision.   The United States opposed the motion on June 3, 2010.   Oral argument was held on June 14, 2010.

### IV. LEGAL STANDARD.

#### A.   Rule 59(e)

Federal Rule of Civil Procedure 59(e) provides a mechanism for a court to alter, amend, or vacate a prior order. See Fed. R. Civ. Pro. 59(e);   *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1415 (9th Cir. 1994).   "While Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003); *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890-91 (9th Cir. 2000).   "A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001). In other words, where a party presents no arguments in the motion for reconsideration that had not already been raised in opposition

1   to summary judgment, Rule 59(e) relief may be denied.   *Taylor v.*

2   *Knapp*, 871 F.2d 803, 805 (9th Cir. 1989);   *Backlund v. Barnhart*,

3   778 F.2d 1386, 1388 (9th Cir. 1985).   "Rule 59(e) amendments are

4   appropriate if the district court (1) is presented with newly

5   discovered evidence, (2) committed clear error or the initial

6   decision was manifestly unjust, or (3) if there is an intervening

7   change in controlling law."   *Dixon v. Wallowa County*, 336 F.3d

8   1013, 1022 (9th Cir. 2003).   This standard is a "high hurdle."

9   *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001).   Rule 59(e)

10  motions "may not be used to raise arguments or present evidence for

11  the first time when they could reasonably have been raised earlier

12  in the litigation."   *Marlyn Nutraceuticals, Inc. v. Mucos Pharma*

13  *GmbH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009);   *Carroll*, 342 F.3d

14  at 945.   Rule 59(e) "does not provide a vehicle for a party to undo

15  its own procedural failures [or] allow a party to introduce new

16  evidence or advance new arguments that could and should have been

17  presented to the district court prior to the judgment."

18  *DimarcoZappa v. Cabanillas*, 238 F.3d 25, 34 (1st Cir. 2001).

19

20                          **V.   DISCUSSION.**

21       **A.   RCRA**

22       The City contends that relief under Rule 59(e) is appropriate

23  for three reasons: (1) the Court erroneously concluded that a

24  facility must be on the National Priorities List ("NPL") in order

25  for there to be a § 120 cleanup; (2) the Court erred when it failed

26  to recognize that downgradient contamination is included in the

27  definition of "facility" under RCRA; and (3) there exists "newly

28  discovered" evidence concerning TCP contamination at the OHF.

### 1. National Priorities List

The City first argues that it meets the requirements set forth in Federal Rule 59(e).  In particular, the City submits that the Court erroneously held that a facility must be on the NPL in order for the remediation to proceed under § 120.  Accordingly, the City's arguments implicate the "clear error" language of Rule 59(e).

The NPL is the list of hazardous waste sites eligible for long-term remedial action financed under the federal Superfund program.  *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1227 fn. 4 (10th Cir. 2006).  CERCLA requires the EPA to maintain the NPL, which is intended primarily to guide the EPA in determining which sites warrant further investigation.  *Village of DePue, Ill. v. Exxon Mobil Corp.*, 537 F.3d 775, 779 (7th Cir. 2008).  CERCLA and accompanying EPA regulations outline a formal process for assessing hazardous waste sites and placing them on the NPL.  *See* 42 U.S.C. § 9605; 40 C.F.R. § 300.425.  A site's cleanup may not be financed by Superfund monies unless the site is on the NPL.  *Village of DePue*, 537 F.3d at 779.  Placement on the list does not mean, however, that any remedial or removal action must be taken by the government.  *Id*.

Relying on *Beck v. Prupis*, 529 U.S. 494 (2000), *Romero-Ruiz v. Mukasey*, 538 F.3d 1057, 1062 (9th Cir. 2008)*, United States v. Colorado*, 990 F.2d 1565 (10th Cir. 1993), and 42 U.S.C. § 9620(a)(4), the City argues that it was clear error to hold that "a remediation is not a federal cleanup conducted pursuant to Section 120 unless it is on the NPL."  However, absent from the City's string citation - and motion - is specific language of the April

**6**

22, 2010 Memorandum Decision holding that an NPL listing is an absolute prerequisite to a § 120 cleanup.  This is best explained by the non-existence of such language, especially given the length and detail of the City's motion.  A review of the April 22, 2010 Memorandum Decision makes clear that listing on the NPL was but <u>one</u> of five factors in the analysis:

> all the evidence points to the applicability of § 104: the language of the cooperative agreement; OHF is privately owned by the City of Fresno; OHF is not listed on the NPL; the EPA is not involved in the cleanup of OHF; and neither AVCRAD nor CANG is involved in any aspect of the OHF cleanup.  Nor does the City explain the specific inclusion of E.O. 12580 and DERP in the cooperative agreement (as opposed to the language re: the authority of § 120 to cleanup AVCRAD and CANG).[4]

*City of Fresno v. United States*, --- F. Supp. 2d ----, 2010 WL 1662476 at 14 (E.D. Cal. 2010).

The Memorandum Decision referenced the NPL when analyzing the relevant case law, including *Pollack v. U.S. Dep't of Defense*, 507 F.3d 522 (7th Cir. 2007), *Fort Ord Toxics Project, Inc. v. Cal. EPA*, 189 F.3d 828 (9th Cir. 1999), *Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d 1194 (N.D. Cal. 2005), and *City of Moses Lake v. United States*, 416 F. Supp. 2d 1015 (E.D. Wash. 2005).  However, any discussion of the NPL was limited to harmonizing the facts of this case with *Pollack*, *Fort Ord, Shea Homes,* and *Moses Lake,* four cases addressing the NPL in the context of §§ 104, 113(h), and 120:

> Applying Pollack, § 120 'merely supplements the

---

[4] CANG refers to the "California Air National Guard," and AVCRAD denotes the "California Aviation Classification Repair Depot."

existing CERCLA regime by bringing federal property owners up to the same standards as private owners; it does not create a separate system for the feds.' Id. at 525. Under Pollack, § 120 does not provide a separate grant of authority beyond the facts of Fort Ord. Assuming, arguendo, that AVCRAD and/or CANG changes the OHF to a 'currently operated federal facility,' the OHF would still be characterized as a 'non-NPL federal property,' not being remediated by the EPA, similar to Pollack and Shea Homes (two § 104 cases). This line of authority does not support the City's position. Here, the OHF is properly classified as a 'non-NPL non-federal property,' which on the spectrum of 113(h) cases is one degree from Pollack and Shea Homes (non-NPL federal property) and two degrees from Fort Ord (NPL federal property) [...]

The City fails to reconcile the relevant case law, including Pollack, Shea Homes, Moses Lake, and OSI, Inc. v. United States, 525 F.3d 1294 (11th Cir. 2008). They involved materially different issues from the one in this case. Pollack, Shea Homes and OSI, Inc. dealt with whether 113(h)'s jurisdictional bar applied to federal facilities that were not listed on the NPL and/or did not involve the EPA. Conversely, Fort Ord [...] dealt with a federal facility that was listed on the NPL and involved the EPA. The OHF is a non-NPL non-federal property with no EPA involvement.

*City of Fresno v. United States*, --- F. Supp. 2d ----, 2010 WL 1662476 at 12.

The City's arguments are unpersuasive. The Memorandum Decision expressed no view on whether listing on the NPL was a prerequisite to finding a cleanup under § 120. Rather, it noted that the remediation site in this case was not listed on the NPL, did not involve the EPA, and, in that respect, was unlike *Fort Ord* and *Moses Lake*, two cases cited by the City. The analysis ended there. Given the language of the Memorandum Decision, it is difficult to understand the City's arguments, which are misleading and deficient in their failure to address the Cooperative

8

Agreement's provisions.[5]   **The motion in this regard is DENIED.**

### 2.   "Ample Factual Basis"

The City next argues that there existed an "ample factual basis" to conclude that CANG and AVCRAD are part of the cleanup,

---

[5]   The City contends that CANG/AVCRAD locations are "prime examples" of § 120 cleanups that were not listed on the NPL.  The Memorandum Decision is silent on this point.   In a footnote, however, the Memorandum Decision contrasted the language of the CANG/AVCRAD properties with that of the "remediation site" and OHF cleanup:  "The language used to incorporate § 120 - for the AVCRAD and CANG cleanup - differs from the language used in the OHF-RAP and Cooperative Agreement to remediate the OHF."  *City of Fresno v. United States*, --- F. Supp. 2d ----, 2010 WL 1662476 at 11, fn. 12. No opinion was expressed on whether the CANG/AVCRAD cleanup exemplified a § 120 cleanup on federal property (not listed on the NPL).    The City's "prime example" argument also raises the following questions: if the CANG/AVCRAD cleanup was selected under § 120, why was the OHF cleanup selected under *different* language, i.e., why did the parties rely on E.O. 12580, § 104, and the DERP/FUDS program to select the OHF cleanup? (*Compare* Doc. 45-6 at ¶ 4.1 ("The National Guard Bureau and the USACE enter into this Agreement pursuant to CERCLA/SARA, the NCP, Executive Order (EO) 12580, and DERP.") *and id.* at ¶ 13.3 ("The authority of the National Guard Bureau to exercise the delegated authority of the President of the United States pursuant to CERCLA and E.O. 12580, is not altered by this Agreement, except to the extent mandated by CERCLA section 120(a).") *with id.* at ¶ 5(ag) (defining the remediation "site" as "the area set forth as 'Old Hammer Field" on the map included as Appendix C and any area off OHF to or under which a release of hazardous substances has migrated, or reasonably threatens to migrate, from a source on or at OHF.").)   The City does not address this inconsistency, electing to argue - on a motion for reconsideration - that its RCRA claim survives because "the 'facility' necessarily includes the reach of contamination from the current federal operations, and the cleanup continues to be conducted under Section 120."   The City's theory ignores the language of the RAP/Cooperative Agreement, relies on new arguments/facts, fails to harmonize existing case law, and refers to the "inclusion of the NPL" as an "interesting" question.

9

**leading to a § 120 cleanup, not § 104.[6]  Specifically, the City alleges that the term "federal facility" is not limited to "the footprint of the federally-occupied building or grounds [...] instead, facility is defined [] as any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."   To support its arguments, the City relies on the term "facility" as defined in CERCLA § 101(9), 42 U.S.C. § 9601(9).[7]**

**Until this motion for reconsideration, the City never raised**

---

[6] The analysis assumes that AVCRAD/CANG's presence at the OHF airfield *generally* transmutes the targeted remediation site to a "facility" under § 101(9).   In its opposition, however, the government notes: (1) the remediation site is separate and distinct from the AVCRAD/CANG facilities, and was so defined in the RAP; and (2) § 120 makes clear that "federal facilities" are limited to facilities that are owned or operated by the federal government. Applied to the facts of this case, the government observes that an off-site federal facility does not transmute the character of an existing cleanup based on allegations of downgradient contamination.   According to the government, the City's analysis ignores the cooperative agreement, the FUDS/DERP statute, and existing case law.

[7] 42 U.S.C. § 9601(9) provides, in relevant part:

The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

*Id.*

**10**

or discussed CERCLA § 101(9).[8]  In responding to the United States'
original and renewed motions, the City did not reference CERCLA's
definition of "facility," nor did it discuss its relevance to the
§ 113(h) analysis.  The City does not provide any justification as
to why it could not, and did not, previously present its argument
in response to the original or renewed motions.  Nor does the City
explain why it did not request to file supplemental briefing on
this issue prior to the issuance of the Memorandum Decision.

In this Circuit, matters that were not presented in the first
instance by a well-represented party are not considered on a motion
for reconsideration.  *See 389 Orange Street Partners v. Arnold*, 179
F.3d 656, 665 (9th Cir. 1999).  The expectation is that counsel
will raise the issues that are to be decided, as the Court cannot
be expected to anticipate a party's position.  *See, e.g., United
States v. Rahmani*, No.01-CR-00209-RMT, 2009 WL 449083 at 1 (C.D.
Cal. Feb. 20, 2009).  As made clear by the Ninth Circuit, a motion
for reconsideration "may not be used to raise arguments or present
evidence for the first time when they could reasonably have been
raised earlier in the litigation." *Kona Enter., Inc. v. Estate of
Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).  The City's unexplained,
belated attempt to challenge the characterization of the OHF

---

[8] To support its arguments, the City also relies on: (1) CANG
and AVCRAD are represented on the OHF Steering Committee since the
1990's; (2) CANG and AVCRAD contaminated the OHF site; and (3) the
United States recently advanced a CERCLA claim against the City and
Boeing for remediation work it performed at the CANG property.
These evidence/arguments were either advanced in its original
briefing or could have been raised at that time.  They are
therefore not new matter.  *See Kona Enter., Inc. v. Estate of
Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (citations omitted)

1   cleanup is not grounds to modify the April 22, 2010 Memorandum
2   Decision, because the City waived this argument by failing to
3   present it in either of its two lengthy oppositions.[9]  As has now
4   become a pattern, it was not raised prior to the April 22, 2010
5   Memorandum Decision and is foreclosed under well-established Ninth
6   Circuit precedent.

7       Even considering the substance of the City's arguments, its
8   latest challenge has no merit.  First, the City does not explain
9   how its § 101(9) arguments alter the existing § 104 remedial action
10  selected in the operative agreements/action plans.  Second, the
11  case law does not mandate a different result.

12      The initial infirmity with the City's position is that it does
13  not connect § 101(9)'s "facility" language to the existing remedial
14  cleanup at the OHF.  For example, while it is true that § 101(9)
15  broadly defines "facility" for CERCLA purposes, the City does not
16  explain why § 101(9)'s language controls the § 113(h) analysis.
17  Assuming, *arguendo*, that the AVCRAD/CANG's operations convert the
18  entire OHF into a "federal facility," the cleanup still lacks the
19  "separate grant of authority" found in *Fort Ord* and *Moses Lake,* two
20  § 120 cases.[10]  In this context, *OSI, Inc. v. United States*, 525

21

22      [9] Nor did the City advance CERCLA § 101(9) during the two
23  rounds of oral argument on the United States' motion to dismiss the
    RCRA claim (December 3, 2007 and March 22, 2010).

24      [10] The cooperative agreement defines "federal facilities" as
25  "the Fresno Air National Guard Base and the Army National Guard
    Shields Avenue Facility and the real property, located at FAT,
26  subject to the jurisdiction of the 144th Fighter Interceptor Wing
    and/or Army National Guard Shields Avenue Facility Commanding
27  Officers, respectively, as identified in Appendix C."  (Doc. 45-6
    at ¶ 5(k).  The City's arguments do not reconcile the cooperative
28  agreement's "federal facility" definition with § 101(9).

F.3d 1294 (11th Cir. 2008) is instructive.   There, as here, the plaintiff argued that its RCRA claim survived a § 113(h) challenge because *all* remedial actions at federal facilities are selected under § 120, not § 104.   The Eleventh Circuit disagreed:

> OSI argues remedial actions on federal facilities are "selected under" § 9620 - not § 9604 - and therefore are not subject to § 9613's jurisdictional bar because § 9620 is the exclusive source of authority for cleanups on federal lands.
>
> While § 9620's discussion of federal facilities is extensive, we have searched the language of the section in vain for a general authorization for the federal government to engage in remedial actions on federal facilities.  The only language approaching such a grant of authority is in § 9620(e), which, as stated above, says a department 'shall' engage in remedial investigation and action, but only after the site has been included on the NPL.  Section 9620 contains no language authorizing any remedial activity if the site is not listed on the NPL.  It is undisputed that the OU-1 site has not been placed on the NPL.  The only language authorizing remedial actions on such sites is found in § 9604, the language of which is broad enough to be read as an authorization for all remedial actions, regardless of the land upon which the action takes place.  Therefore, we hold the Air Force's remedial action for OU-1, a federal facility not listed on the NPL, was 'selected under' § 9604 and is subject to the jurisdictional bar of § 9613(h). The district court lacked jurisdiction to hear OSI's RCRA citizen suit while the remediation is ongoing. See Alabama v. EPA, 871 F.2d at 1560.

*Id.* at 1298-99.

The Eleventh Circuit in *OSI, Inc.* further reasoned that "[w]here a federal facility is not listed on the NPL, the only language authorizing remedial or removal actions is found in § 9604":

> Our view of § 9613(h) for federal facilities not listed on the NPL comports with the view of the Seventh Circuit [in Pollack v. U.S. Dep't of Defense, 507 F.3d 522, 525-27 (7th Cir. 2007)].  The only other Circuit to address the jurisdictional bar for federal facilities and the source of authority for remedial

**actions is the Ninth Circuit in Fort Ord Toxics Project, Inc. v. California EPA, 189 F.3d 828 (9th Cir. 1999), which held challenges to federal site cleanups were not subject to § 9613(h)'s jurisdictional bar. As the court in Pollack noted, however, Fort Ord is distinguishable because there the federal facility was listed on the NPL. Where a federal facility is not listed on the NPL, the only language authorizing remedial or removal actions is found in § 9604; such actions therefore are subject to the jurisdictional bar of § 9613(h) because the remediation is "selected under section 9604." 42 U.S.C. § 9613(h).**

*Id.*

Cutting against the City's arguments is that its restyled § 113(h) analysis involves but a single step: is the remediation site part of a larger "facility" under § 101(9)? Such a limited query ignores the 113(h) factors analyzed in *Fort Ord*, *OSI, Inc.*, *Pollack*, *Shea Homes*, and *Moses Lake*.[11] To varying degrees, these

---

[11] Critical to the analysis, the City does not address *Shea Homes Ltd. P'ship v. United States*, 397 F. Supp. 2d 1194, which held:

> In this case, however, the site at issue is not included on the National Priorities List and the EPA is not involved. As a result, authority to undertake the clean up has been delegated to the Secretary of Defense. See Section 104 of CERCLA, 42 U.S.C. § 9604 (authorizing the President to act in response to releases of hazardous wastes); Exec. Order 12580 at § 2(e) (delegating authority under § 104 to the Department of Defense with respect to contamination on Defense Department facilities); see also Def.'s Ex. 21 at 2.
>
> Thus the rationale underlying the holding in Fort Ord-the creation of a separate authority in § 120 for the Administrator to conduct remedial actions at federal facilities - is simply not applicable here. Fort Ord, of course, did not have occasion to address the relationship between § 120 and § 113(h) in cases, such as this, where the clean up is not being conducted pursuant to the Administrator's authority. Given however, that Fort Ord carved out an exception to the general jurisdictional bar in § 113(h), the Court is not

14

**cases recognized the importance of the NPL, property ownership, EPA involvement, prior contractual language, and whether the cleanup was part of the DERP/FUDS process, among other factors.[12]   The City's test ignores these factors in favor of § 101(9), which has never been applied in the § 113(h) context.   Moreover, the City overlooks the language of the Cooperative Agreement, which provided that the cleanup advanced under the FUDS/DERP statue and E.O. 12580, not § 120.   The City does not attempt to reconcile its § 101(9) theory with either the relevant case law or the controlling**

---

persuaded that it is appropriate to extend Fort Ord beyond the clear rationale and facts of that case.  As such, it rejects Plaintiff's contention that this case is governed by Fort Ord, and concludes that the response actions in this case were authorized by § 104 and thus are governed by § 113(h).

*Id.* at 1203.

[12] In its opposition, the government expanded on the importance of the DERP/FUDS program in the context of this case:

There is no dispute that the Corps is conducting its response action under its FUDS program. The Corps conducts its FUDS cleanups pursuant to 10 U.S.C. § 2701(c)(1)(B), which authorizes the Defense Environmental Restoration Program ("DERP"). That statute implements the CERCLA Section 104(a) cleanup authority which Congress delegated to the President. In Executive Order 12580, the President delegated cleanup authority with respect to formerly used defense sites to the Secretary of Defense.  The relevant language of the Cooperative Agreement is consistent with the conclusion that the cleanup of Old Hammer Field is being undertaken pursuant to Section 104, Executive Order 12580, and the DERP/FUDS program [...] In fact, there is no such thing as a FUDS cleanup selected under Section 120.

(Doc. 287 at 4:7-4:21) (citations omitted).

15

Cooperative Agreement.

Additionally, the City's cited cases have nothing to say about whether a remedial action proceeds under § 104 or § 120.   In particular, the cited authorities were limited to analyzing CERCLA § 103 (*Sierra Club v. Seaboard Farms, Inc.*, 387 F.3d 1167, 1175 (10th Cir. 2004)), § 106(a) (*United States v. Tropical Fruit, S.E.*, 96 F. Supp. 2d 71 (D.P.R. 2000)), and § 107 (*Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1074 (9th Cir. 2006); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1151 (1st Cir. 1989)).   These authorities never reached the issue of whether a late-developing, off-site § 101(9) "facility" transmutes an existing § 104 cleanup to one under § 120, especially in light of the scope and specificity of the Cooperative Agreement.

To be clear, whether § 120 provides a separate grant of authority for the President to initiate cleanups of federal sites beyond the facts of *Fort Ord* need not be resolved here.   It is enough to note the Seventh and Eleventh Circuit's decisions in *Pollack* and *OSI, Inc.*, distinguish the facts and "separate grant of authority" of *Fort Ord* and *Moses Lake*, and analyze the specific facts of this case under existing case law.   Contrary to the City's assertions, the sheer consistency of cases analyzing EPA involvement and/or listing on the NPL on a § 113(h) challenge requires an examination of these two factors.   *See, e.g., Fort Ord Toxics Project, Inc.,* 189 F.3d 828, 833-34   (relying on the undisputed fact that the clean up at issue was a remedial action being conducted by EPA pursuant to the grant of authority created by § 120).

The City's post hoc reasoning ignores the analysis contained

in the April 22, 2010 Memorandum Decision.  The entire record reveals that CERCLA § 104 applies to the OHF cleanup, not § 120.[13] Further, the City offers no response to several of the questions posed in the April 22, 2010 Memorandum Decision, instead offering a series of arguments based on the 20-20 vision of hindsight in an exercise of Monday morning quarterbacking.[14]

Also weighing against the City is that the parties are conducting - and funding - a remediation program at the OHF in conjunction with the State of California, which has oversight over the remediation through the DTSC and RWQCB.  Although the City minimizes the impact of its proposed injunctive relief, any

---

[13] Here, the cleanup proceeds under E.O. 12580 and the DERP/FUDS statute, implicating § 104 not § 120.  Moreover, there is no EPA involvement and the site is not listed on the NPL.  These two factors drove the analysis in *Fort Ord* and *Moses Lake*.  *See Fort Ord*, 189 F.3d at 833-34 (relying on the undisputed fact that the clean up at issue was a remedial action being conducted by EPA pursuant to the grant of authority created by § 120); *see also City of Moses Lake v. United States*, 416 F. Supp. 2d at 1021 (relying on the EPA's involvement, placement of the site on the NPL, and the interagency agreement stating "that the EPA and the Army enter into this Agreement pursuant to their respective authorities contained in Sections 101, 104, 107, 120 and 122 of CERCLA.") (internal quotations omitted).  Although not dispositive of the inquiry, the absence of these factors - EPA involvement and listing on the NPL - casts doubt on a § 120 finding.  See *OSI, Inc.,* 525 F.3d at 1299; *see also Pollack*, 507 F.3d at 525-27.

[14] Specifically, the City ignores two questions posed in the April 22, 2010 Memorandum Decision: (1) why would the cooperative agreement cite E.O. 12580 and the DERP statute if the cleanup was proceeding under § 120?; and (2) How can a FUDS cleanup - which is, by definition, authorized under § 104 - be covered under § 120?  *See Loughlin v. United States*, 286 F. Supp. 2d 1, 5 (D.D.C. 2003) (stating that FUDS project was "conducted under the authority of the Defense Environmental Restoration Program (DERP), 10 U.S.C. §§ 2701- 2707, and Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq.").

1   judicial intervention necessarily imposes on the DTSC and RWQCB,

2   the agencies supervising the remediation and investigating any

3   alleged environmental hazards.[15]  In contrast to cases such as *Maine*

4   *People's Alliance and Natural Resources Defense Council v.*

5   *Mallinckrodt*, Inc., 471 F.3d 277, 287 (1st Cir. 2006), there is no

6   evidence that any state agency has disregarded its duty to oversee

7   the OHF remediation or to evaluate whether contaminants may present

8   an endangerment to the health or the environment at the OHF.

9   Rather, the opposite is true.  (See, e.g., Doc 45-5, the DTSC's

10  October 4, 1994 "Imminent or Substantial Endangerment Determination

11  and Order" to Rockwell International (Boeing's predecessor); Doc

12  45-12, the DTSC's October 31, 2006 "Imminent or Substantial

13  Endangerment Determination and Order"; Doc. 255-4, the CDHS's

14  letter requesting that the City remove Well 63 from its water

15  system;  Doc. 255-6, the State of California's PHG for TCP,

16  published in August 2009;  Doc. 281-3, email from Carl Carlucci,

17  Regional Director of CDPH, to Lon Martin re: MCL timeline.)

18      In this context, the April 22, 2010 Memorandum Decision's

19  discussion of the conflict between the City's proposed injunctive

20  relief and the ongoing remediation is fully applicable:

21          [T]he State of California, through the DTSC and RWQCB,
            has oversight over the remediation and has the
22          scientific understanding and resources necessary to
            investigate and remediate alleged hazards.  Conversely,
23          the district court has neither the resources nor
            expertise necessary to properly address the scientific
24          issues presented by an alleged imminent and substantial

25  _____

26      [15] Critically, the RAP defines the remediation "site" as: "the
    area set forth as 'Old Hammer Field" on the map included as
27  Appendix C and any area off OHF to or under which a release of
    hazardous substances has migrated, or reasonably threatens to
28  migrate, from a source on or at OHF."  (Doc. 45-6 at ¶ 5(ag).)

1          endangerment to health or the environment.

2          These concerns are shared by a number of district
           courts throughout the United States. See West Coast
3          Home Builders, Inc. v. Aventis Cropscience USA Inc.,
           No. 04-2225-SI, 2009 WL 2612380 (N.D. Cal. 2009)
4          ("There are two fundamental problems with plaintiff's
           RCRA claim [ ... ] [f]irst, the Consent Order already
5          requires GBF/TRC to clean up the groundwater
           contamination, and that remediation has been underway
6          for years [ ] Plaintiff seeks relief that it is already
           obtaining outside of this lawsuit."); see also River
7          Vill. W. LLC v. Peoples Gas Light and Coke Co., 618
           F.Supp.2d 847, 854-55 (N.D. Ill. 2008) ( "Unlike the
8          district court, the [agency] has been specifically
           charged with the responsibility to develop and enforce
9          regulations to implement the environmental laws passed
           by Congress [ ... ] the district court's handling of
10         this matter would be delayed by years if research and
           discovery which would be necessary to develop a basic
11         understanding of the [contamination area and hazards
           presented].").; OSI, Inc. v. United States, 510 F. Supp.
12         2d 531 (M.D. Ala. 2007) ("OSI has presented no [ ]
           evidence to suggest that an imminent or substantial
13         endangerment to health or the environment exists on OSI
           or Government property.  Furthermore, the Government is
14         conducting a remediation program in conjunction with
           ADEM to repair any contamination and resulting dangers
15         that do exist [ ... ] [t]hese two factors together lead
           the Court to conclude that the Government is entitled
16         to summary judgment.");  Davis Bros., Inc. v. Thornton
           Oil Co., 12 F. Supp. 2d 1333, 1338 (M.D.Ga.1998) (
17         "[P]laintiff has presented no credible evidence
           supporting a finding of imminent and substantial
18         endangerment to health or the environment [  ...
           ][m]oreover, the proposed remedy of injunctive relief
19         is moot because Conoco has already agreed to remediate
           the site and pay for any costs associated with the
20         cleanup, and the state is overseeing the cleanup more
           effectively than the court ever could.  Thus, the RCRA
21         claim fails on the merits, and is also moot.").  This
           language applies with equal force to this case.

22

23  City of Fresno v. United States, --- F. Supp. 2d ----, 2010 WL

24  1662476 at 15.

25      The City simply overreaches in an area where further judicial

26  intervention is not required.   The City's motion for

27  reconsideration is DENIED.

28

                                    19

### 3.   **1,2,3 - trichloropropane ("TCP")**

**The substance of the City's next argument is that the April 22, 2010 Memorandum Decision "underestimate[d] the impact of TCP at FAT." According to the City, its Rule 59 motion is sound because TCP presents an "imminent and substantial endangerment" and its request for relief is not a "challenge" to the current remedial action plan. The United States rejoins that the City does not present any "newly discovered" evidence and, even if it did, its evidence does not establish an "imminent and substantial endangerment" as that term is defined by 42 U.S.C. § 6972(a)(1)(B).**

**Assuming, *arguendo*, that § 113(h) does not bar the City's entire RCRA claim,[16] and that it is not otherwise foreclosed,[17] the**

---

[16] Whether the City's request for relief is a "challenge" to the current remedial action plan was resolved in the April 22, 2010 Memorandum Decision. As stated in the Memorandum Decision, the City's arguments have been rejected by the Ninth Circuit in *McClellan Ecological Seepage Situation ("MESS") v. Perry*, 47 F.3d 325, 330 (9th Cir. 1995) and *Razore v. Tulalip Tribes*, 66 F.3d 236 (9th Cir. 1995). In *MESS*, the Ninth Circuit took a broad view of the scope of § 113(h). There, the plaintiffs made an argument similar to that advanced here: that their RCRA claim was not a "challenge" under § 113(h) because it was not attempting to delay or modify the remedy, but rather only sought to compel the defendant's compliance with RCRA's requirements. *Id.* at 330-31. The Court held that while tangentially related claims, such as those to enforce minimum wage requirements, do not constitute a challenge under § 113(h), the plaintiffs' claim was "far more directly related to the goals of the cleanup itself." *Id.* at 330. The Court also concluded that for "all practical purposes" the plaintiffs were effectively seeking to "improve" the clean up. *Id.* As such, it found that the plaintiff's claim was a "challenge" barred by § 113(h). *Id.*

*MESS*, *Razore*, and *SPPI-Somersville, Inc. v. TRC Companies, Inc.*, 2009 WL 2612227 control the facts of this case. In *SPPI-Somersville*, Plaintiffs contended that the current remediation plan did not address the danger posed by vapor intrusion, and thus that the RCRA injunctive relief was viable. The court rejected

**City's motion fails because it does not satisfy the imminent and substantial endangerment element of its RCRA claim.  RCRA provides for citizen suits "against any person ... who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).  Under this section, "[a]n endangerment can only be 'imminent' if it 'threatens**

this argument:

> There are a number of problems with this assertion. First, even if the Court granted the relief that plaintiffs describe in their papers regarding soil vapor, such as ordering TRC to conduct a study of the site-specific soil gas conditions, DTSC would necessarily be involved in that process, and would make the determination as to whether mitigation was necessary.

*Id.* at 15.

This language applies with equal force to this case.  The City rejoins that the proposed injunctive relief merely "supplements" the existing cleanup.  However, any judicial order adding an additional contaminant necessarily imposes on the currently cleanup and impacts the DTSC and RWQCB.  It also raises a number of practical and administrative concerns. *See, e.g., River Vill. W. LLC,* 618 F. Supp. 2d at 854-55 ("Unlike the district court, the [agency] has been specifically charged with the responsibility to develop and enforce regulations to implement the environmental laws [...] the district court's handling of this matter would be delayed by years if research and discovery which would be necessary to develop a basic understanding of the [contamination area and hazards presented].")

[17] Specifically, whether under the primary jurisdiction doctrine, the administrative forum provided by the State of California is the appropriate forum for resolution of the City's claims concerning the cleanup of the OHF.  There is also an argument that the City's RCRA claim is moot.

to occur immediately.'"   *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) (quoting Webster's New International Dictionary of English Language 1245 (2d ed. 1934)). "[T]his language 'implies that there must be a threat which is present now, although the impact of the threat may not be felt until later.'"   *Id.* (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994)). To show an "imminent and substantial" threat, the plaintiff must do more than establish the presence of solid or hazardous wastes at a site. *Foster v. United States*, 922 F.Supp. 642, 661 (D.D.C. 1996). Instead, "endangerment must [be shown to] be substantial or serious, and there must be some necessity for the action." *Price*, 39 F.3d at 1019.   Also, the fact that remedial activity in accordance with CERCLA has commenced at a site greatly reduces the likelihood that a threat to health or the environment is imminent. *See Christie-Spencer Corp. v. Hausman Realty Co., Inc.*, 118 F. Supp. 2d 408, 419-23 (S.D.N.Y. 2000).

To establish imminent and substantial endangerment, the City submits TCP test results from 2002 and 2009.   According to the City, in 2002, it sampled Well 63 for TCP.   The samples indicated TCP levels of more than 100 times the regulatory action/notification level, specifically 0.67 parts per billion.[18] The City conducted further sampling of TCP levels at the OHF in December 2009.   The City states that the December 2009 samples revealed TCP levels ranging from .16 to .95 parts per billion at

_____

[18] On March 1, 2004, the State of California requested that the City remove Well 63 from its water system due to excessive levels of TCP.   The City removed Well 63 from the water system shortly thereafter.

1  locations downgradient from where the United States historically or
2  currently operates, including Well 70.   The 2009 samples also
3  detected TCP levels at Well 63 at concentrations of .3 parts per
4  billion, which is 60 times the action level set by the CDHS.

5      The City further relies on the fact that two California
6  agencies established non-binding environmental standards concerning
7  TCP.  First, in 1999, the California Department of Health Services
8  ("CDHS") established a notification level for TCP of 0.005 parts
9  per billion (5 parts per trillion).[19]  The CDHS also set a "response
10 level" for TCP, which is the level at which the State recommends
11 taking a drinking water source out of service.   Currently, the
12 response level is 100 times the notification level.   Second, the
13 California   Office   of   Environmental   Health   Hazard   Assessment
14 ("OEHHA") set a public health goal ("PHG") for TCP of 0.007 parts
15 per billion (7 parts per trillion).

16     It is undisputed that California recognizes TCP as a
17 carcinogen. It is similarly beyond dispute that TCP is an
18 "unregulated contaminant" and the basis for the notification level
19 was   TCP's   cancerous   effect   on   laboratory   animals.   *See*
20 www.cdph.ca.gov/certlic/drinkingwater/Pages/123tcp.aspx,
21 ("1,2,3-TCP causes cancer in laboratory animals (US EPA, 1997),
22 which is the basis for the notification level" and "[the CDPH]
23 adopted   a   regulation   that   included   [TCP]   as   an   unregulated
24 contaminant for which monitoring is required.") (last visited June
25 21, 2010).   The parties also recognize that "the likely timeline

27      [19] The CDHS is now known as the California Department of Public
28 Health ("CDPH").

23

1  for the development and adoption of the MCL [for TCP] is at least

2  4 years from now."[20]   (See Doc. 281-3, Email from Carl Carlucci,

3  Regional Director of CDPH, to Lon Martin, the Assistant Director of

4  the Public Utilities Department for the City of Fresno.)   The

5  parties dispute the importance and meaning of the four-year

6  regulatory timeline.[21]

7      The final item of evidence advanced by the City is the

8  deposition transcript of Dr. Robert J. Sterrett, a hydrogeologist

9  retained by the City to opine on the sources and migration patterns

10 of VOCs at the OHF.   On December 30, 2009, the City submitted

11 Sterrett's signed expert report, which was supplemented on January

12 29, 2010.   (Docs. 191-5 through 191-8 and 195-6.)   However,

13 Sterrett did not opine that TCP is "an imminent and substantial

14 endangerment to health or the environment" in his expert or

15 supplemental reports.   Rather, Sterrett expressed his "expert

16 opinion" for the first time at his February 2, 2010 deposition.

17     In sum, the City argues that the TCP levels exceeding the

18 State's non-binding standards, taken in combination with the

19 Sterrett's expert testimony, present a genuine dispute of fact on

20 whether TCP presents an imminent and substantial endangerment to

21 public health at the OHF.   The City's TCP arguments entail both the

22

23     [20] Carlucci's email was in response to "a question [] about the
24 timeline for the MCL development by Department of Public Health."
   (See Doc. 281-3.)

25     [21] For example, the government argues that "the State's
26 estimate that there will not be an MCL for TCP for at least four
   more years only confirms [] that there is no imminent and
27 substantial endangerment to health or the environment at Old Hammer
   Field."   (Doc. 287 at 11:15-11:16.)   The City disputes the
28 government's interpretation.

"clear error" and "newly discovered evidence" grounds of Rule 59(e).

The government responds that the City fails to meet its Rule 59 burden because the evidence is not "newly discovered." The government contends that the sampling results and Sterrett's deposition transcript could have been presented in the City's oppositions or filed as a supplement, but were not. While the government acknowledges that the City introduced portions of its TCP evidence at oral argument, it characterizes this action as "hasty" and observes that the City failed to supplement its briefing or expert reports.

In this Circuit, matters not presented in the original briefing are not considered on a motion for reconsideration. *See 389 Orange Street Partners v. Arnold*, 179 F.3d 656, 665. A motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enter., Inc. v. Estate of Bishop*, 229 F.3d 877, 890. First, the City had an opportunity to file a detailed declaration delineating Sterrett's testimony following his February 2, 2010 deposition. The City declined to present the evidence in this form, preventing adverse parties from addressing it.[22] It is similarly unclear why the City introduced portions of the December 2009 TCP samples at oral argument on March

---

[22] It is undisputed that the City did not supplement Dr. Sterrett's report to advance his opinions re: TCP, as required by Rule 26 of the Federal Rules of Civil Procedure.

22, 2010, instead of via a court filing or declaration.[23]

Even assuming, *arguendo*, that the City's Rule 59 motion is properly supported, its motion for reconsideration fails because it does not establish the seminal point, i.e., that the disposal of TCP at the OHF may present an imminent and substantial endangerment to health or the environment.   The City was required to show more than that TCP exists at or near the OHF airfield.   The risk of endangerment from the TCP contamination must be *imminent* for there to be a claim under RCRA.   *See Crandall v. City and County of Denver, Colo.*, 594 F.3d 1231, 1237 (10th Cir. 2010) (stating that "[o]ne essential point that Plaintiffs appear to overlook is that although the harm may be well in the future, the endangerment must be imminent.") (citation omitted).   Moreover, the City's proffered evidence has failed to raise a genuine dispute of fact as to the seriousness of the risk posed by TCP.   *See, e.g., Newark Group, Inc. v. Dopaco, Inc.*, No. 2:08-CV-02623-GEB-DAD, 2010 WL 1342268 at (E.D. Cal. Apr. 2, 2010) ("Absent additional evidence, the mere fact that [plaintiff] has produced such samples does not support a reasonable inference that [the contamination on its Property]

_____

[23] At oral argument on June 14, 2010, the City's counsel stated that it presented portions of the TCP evidence during March 22, 2010's oral argument because: "our goal for oral argument in 2010 [re: United States' RCRA motion] [was] to focus on what we briefed the court on for sake of simplicity and believing the court would probably reserve the imminent and substantial endangerment issue as a factual dispute more suited for resolution at trial and that is how we postured that particular motion and our response to it." The United States countered that "there have been a handful of opportunities of all parties to submit [evidence]" and that the City confirmed that it had presented all of its evidence at the close of the March 22, 2010 hearing date, when the matter was submitted for decision.

presents an imminent and substantial endangerment to health or the environment.") (citations and internal quotations omitted).

The inadequacy of the City's evidence is best demonstrated by the February 2, 2010 deposition testimony of Dr. Sterrett, which the City claims distinguishes this case from *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199 (2d Cir. 2009).[24] At the outset, it is important to note the progression of Sterrett's "expert opinions" during the different stages of the case, i.e., first during expert disclosures, second, during his deposition, and, last, for the City's current motion for reconsideration. Sterrett's original expert report, filed December 30, 2009, contains a brief opinion on TCP, and it is qualified at best: "There are *apparently* at least two sources of 1,2,3-TCP in the vicinity of OHF. One is *probably* on the eastern portion of OHF and the other is between Wells 306 and 63." (See Doc. 191-5, "Sterrett's Expert Report," at pg. 28.) (emphasis added). Critical to the analysis, Sterrett excludes TCP as a contaminant causing an "imminent and substantial endangerment" at the OHF. The expert report provides, in relevant part:

---

[24] In *Metacon*, the Second Circuit affirmed summary judgment in favor of the defendants on the plaintiff's RCRA claim. The court held that discarded lead at a gun club site did not present an "imminent and substantial endangerment to health or environment," and thus did not warrant injunctive relief under RCRA, despite the plaintiff's expert report that found that various samples drawn from site exceeded state thresholds for residential sites and concluded that lead represented potential exposure risk to humans and wildlife. *Id*. at 210-212. The court found that there was no triable issue of fact on "imminent and substantial endangerment" where the report did not state the degree of potential exposure to lead contamination on site, or provide any evidence that anyone was subject to long-term exposure to lead contamination at site, or that there were realistic pathways of exposure there. *Id*.

**Question:** Would the cessation of remedial activities result in an imminent and substantial endangerment to health or the environment?

**Opinion:** The presence of TCE in groundwater in excess of MCLs results in a situation of imminent and substantial endangerment to heath [sic] or the environment as outlined by the USEPA. This opinion is also supported by the fact that the DTSC has issued an Imminent and Substantial Endangerment Order.

(*Id.* at pg. 27.)

There is no opinion that TCP presents an imminent and substantial endangerment to health or the environment in Sterrett's expert report.[25]

Sterrett's February 2, 2010 deposition testimony is similarly flawed. Although he conclusorily recited § 6972(a)(1)(B)'s "magic words," Sterrett attributed TCP's "substantial and imminent endangerment" to the State's non-binding public health goal. The opinion was also qualified and did not state with specificity the degree of potential exposure to risk to humans and the environment or provide any evidence that anyone was subject to long-term exposure to TCP contamination or that there were realistic pathways of exposure at the OHF:

**Q:** But my question has to do with whether TCP in groundwater poses an imminent substantial endangerment, and I don't think you've answered that one yet.

**A:** I would have to say yes, just because I think if we let it go, the State of California would require

_____

[25] This excerpt also demonstrates that Sterrett had notice of the presence of TCP at the OHF at the time of his expert report, but did not opine that TCP caused an imminent and substantial endangerment. In addition, Sterrett's January 29, 2010 supplemental report, filed four days before his expert deposition, did not include his opinion re: TCP.

1          capture of it.

2    **Q:**    What's the basis of that opinion?

3    **A:**    That because of its low public health notification.

4    **Q:**    But the low public health notification only applies
          to water that's being put into the [] drinking
5          system, correct?

6    **A:**    That is correct.

7    **Q:**    So if the TCP is just left in the groundwater below
          the surface and is not being removed to be put into
8          drinking water, there would not be an imminent
          substantial endangerment, would there?
9
10   **A:**    My understanding is the State of California, you
          know, just about all groundwater is going to be
11          considered drinking water. So, you know, having it
          just migrate, I would suspect the State may see it
          differently.
12

13   **Q:**    But it's -- well, you don't recall the RAP, do you?

14   **A:**    Well, the RAP was written, I think, before -- before
          the TCP was probably an issue. I don't recall it
          being in there, but I'm not a hundred percent sure.
15
16   **Q:**    So I guess you would say that you believe that
          perhaps the State of California may -- may believe
17          that the migration of TCP may pose an imminent
          substantial endangerment to [...] the health or the
18          environment?

19   **A:**    Yes.

20   (Doc. 256-14, Dep. of R. Sterrett, at 12:19-15:4.)

21        This review of Sterrett's expert report and his deposition

22   testimony demonstrate that the City's TCP arguments necessarily

23   fail. Although the City's expert recited § 6972(a)(1)(B)'s "magic

24   words," the deposition testimony adds nothing beyond the fact that

25   TCP levels exceed California's non-binding public health goals.[26]

26   ───────────────────────
          [26] The government did not object to Sterrett's TCP opinion on
27   grounds that it violated Rule 702 of the Federal Rules of Evidence.
     However, under Rule 702 if the basis for an expert's opinion is
28   clearly unreliable, the district court may disregard that opinion

It lacks the factual detail and specific exposure evidence found sufficient in *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1020 (10th Cir. 2007) and *California Dept. of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d 930 (E.D. Cal. 2003), two cases relied on by the City. *See Burlington,* 505 F.3d at 1020 (finding genuine issues of material fact existed on plaintiff's RCRA claim based on expert testimony defining the specific carcinogenic effect on industrial outdoor workers (based on soil concentrations), that materials "also pose a threat to pets and wildlife as they are completely exposed," and that the "presence of this exposed material and its eruptive nature constitutes a potential threat to stormwater runoff and waters of the United States."); *see also California Dept. of Toxic Substances Control,* 298 F. Supp. 2d at 981-82 (relying on the DTSC's multiple scientific reports by qualified experts to hold that a triable issue of material fact existed on the issue of

---

in deciding whether a party has created a genuine issue of material fact. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596 (1993) (if "the trial court concludes that the scintilla of [expert] evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to ... grant summary judgment"). Relevant expert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). Both the determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under Fed. R. Evid. 702. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

imminent and substantial endangerment.[27]).  Additionally, Sterrett relied on DTSC's Imminent and Substantial Endangerment Order, dated October 31, 2006, to support his expert opinion.  However, that order did not mention TCP and the DTSC has not since issued an "Imminent and Substantial Order" for TCP.  The City does not provide a single case citation where such an order was analyzed and applied to support a "substantial and imminent endangerment" opinion in this context.[28]

---

[27] The *California Dept. of Toxic Substances Control* court's summary of the plaintiff's expert testimony is instructive:

> Based upon personal observation, high wind conditions, a review of the data contained in Chaney, Walton and McCall's Remedial Investigation report, and department policies relating to ISE designations, Mr. Kovac asserts "the Mobile Smelting Site and neighboring off-site areas constitutes a continuing imminent and substantial endangerment to human health and the environment." Doc. 957 ¶ 26, at 8. Mr. Kovac asserts the threat is neither remote or speculative in nature, nor de minimis in degree. Id. Mr. Kovac contends harm has already occurred and is not simply threatened, as contamination has been widely spread throughout the environment. Id. Additionally, the Site is an ISE because the remediation efforts performed to date include temporary actions which will fail if not renewed or made permanent. Id. ¶¶ 21-25 at 7-8. It is undisputed that soil and ash piles on site are covered with polymer coating that is 1/4 to 1/2 inches thick and the polymer coating is only a temporary cap, which must be renewed approximately every two years. UF 32. It also is undisputed that if the polymer is not renewed, "it will break down and the contaminated sod and ash on the site will be exposed to wind and rain, and the contamination can be spread."

298 F. Supp. 2d at 981.

[28] More convincing is the exchange between the government's counsel and Sterrett concerning his failure to include the TCP

1    **The City's remaining evidence is controlled by *Crandall v.**
2    ***City and County of Denver, Colo.*, 594 F.3d 1231, *Cordiano v.***
3    ***Metacon Gun Club, Inc.*, 575 F.3d 199, and *Newark Group, Inc. v.***
4    ***Dopaco, Inc.*, 2010 WL 1342268. Those cases hold that absent**
5    **additional evidence, the mere fact that a plaintiff has produced**
6    **contaminant samples exceeding non-binding levels does not support**
7    **a reasonable inference that the contamination presents an imminent**
8    **and substantial endangerment to health or the environment. *See,***

9    _____

10   opinion in his original or rebuttal expert reports:

11   Q:   On page 27 of your December 30, 2007 report –- do you
12        have that?  Why didn't you include TCP in your
     opinion?

13   A:   Certainly the emphasis of the October 31 document of
14        2006 from DTSC was primarily focused on these
     chlorinated solvents rather than TCP.

15   Q:   You're referring to the October 31, 2006 DTSC issue,
16        Imminent and Substantial Endangerment Order?

17   A:   Right.  And I think by extension of the fact that TCP
18        has a fairly low action level, that this could be
     extended - TCP could be extended under this.

19   Q:   Under what?
20
21   A:   Imminent substantial endangerment.

22   Q:   Well, as of today, has DTSC amended its Imminent
     Substantial Endangerment Order to include TCP?
23
24   A:   Not that I'm aware of.

25   (*Id.* at 14:5-14:21.)

26       It is clear from this exchange that Sterrett based his TCP
     expert opinion on an extension of the DTSC's "Imminent and
27   Substantial Order," dated October 31, 2006.  However, the Order did
     not mention TCP and the DTSC has not since issued an "Imminent and
28   Substantial Order" for TCP.

*e.g., Metacon Gun Club*, 575 F.3d at 212-13.   Specifically, the *Newark Group, Inc.* court stated: "evidence that certain samples taken from the [the property] exceeded [government] standards simply provides an inadequate basis for a jury to conclude that federal law, specifically, [RCRA's citizen suit provision, § 7002(a)(1)(B),] [42 U.S.C.] § 6972(a)(1)(B), has been violated." 2010 WL 1342268 at 7.   The City submits evidence that TCP was detected at or near the OHF, including Well 70, but at levels it essentially admits are far from immediate.   The City's evidence lacks the "imminence" or "threat" present in *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013 and *California Dept. of Toxic Substances Control v. Interstate Non-Ferrous Corp.*, 298 F. Supp. 2d 930.   This negates any "substantial and imminent" finding under the RCRA framework.[29]

The City has not offered any substantial evidence that the granting of the United States' motion was incorrect, nor has the City provided any new factual evidence to change the analysis.   The City's motion for reconsideration is not supported by any circumstances justifying reconsideration.   The City's motion for

---

[29] It also appears that the purported endangerment of Well 63 is not actionable under RCRA because, under the City's own theory, the harm posed will never occur.  Specifically, Well 63 was closed in 2004, therefore there is no imminent endangerment to future water users of Well 63.  *See Price v. United States*, 39 F.3d 1011, 1019 (9th Cir. 1994) (if no pathway of exposure, no imminent endangerment); *see also Scotchtown Holdings LLC v. Town of Goshen*, 2009 WL 27445 at 3 (S.D.N.Y. 2009) ("Where the only endangerment alleged is to hypothetical occupants who under Plaintiff's own theory will never consume the allegedly contaminated water, and thus will not suffer adverse health effects from it, the case does not fit the narrow criteria set by Congress for citizen suits under RCRA.").

1  reconsideration is DENIED.

2      Even considering the evidence advanced in its Rule 59 motion,
3  the City has not shown a genuine dispute of fact on whether TCP
4  presents an imminent and substantial endangerment at the OHF.   On
5  the current record, its evidence is distinguishable from those
6  cases finding a colorable claim under 42 U.S.C. § 6972(a)(1)(B),
7  including *Burlington N. & Santa Fe Ry. Co. v. Grant* and *California*
8  *Dept. of Toxic Substances Control v. Interstate Non-Ferrous Corp*.
9  The City also understates the prospect of establishing a second
10 cleanup - of an unregulated contaminant - on an existing
11 remediation site managed by several state agencies.

12

13 B.   HSAA Claim

14     The City's final Rule 59(e) argument relates to its claim
15 under the Carpenter-Presley-Tanner Hazardous Substance Account Act
16 ("HSAA"), Cal. Health & Safety Code § 25300 *et seq*., the state law
17 counterpart to CERCLA.   Under HSAA, the DTSC authorizes the
18 cleanup of sites within the state where chemical contamination
19 represents a threat to human health or the environment.   *Fireman's*
20 *Fund Ins. Co. v. City of Lodi, Cal.*, 302 F.3d 928, 934 (9th Cir.
21 2002).

22     Under CERCLA, departments and agencies of the United States
23 are subject to liability to the same extent as any non-governmental
24 entity.   *United States v. Shell Oil Co.*, 294 F.3d 1045, 1052-53
25 (9th Cir. 2002).  Section 120(a)(1) explicitly waives the sovereign
26 immunity of the United States with respect to CERCLA actions.   *Id*.
27 Regarding state laws governing hazardous waste response, §
28 120(a)(4) of the CERCLA statute addresses their application to the

**federal government:**

> **State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States ... when such facilities are not included on the National Priorities List. The preceding sentence shall not apply to the extent a State law would apply any standard or requirement to such facilities which is more stringent than the standards and requirements applicable to facilities which are not owned or operated by any such department, agency, or instrumentality.**

**42 U.S.C. § 9620(a)(4) (emphasis added).**

The law regarding waivers of the sovereign immunity of the United States is straightforward. Absent an express waiver, "the activities of the federal government are free from regulation by any state." *United States v. State of Wash.*, 872 F.2d 874, 877 (9th Cir. 1989) (quoting Mayo v. United States, 319 U.S. 441, 445, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943). Any waiver of United States sovereign immunity must be unequivocal; it cannot be implied. *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992). Such a waiver "must be construed strictly in favor of the sovereign and not enlarged beyond what the language requires." Ohio, 503 U.S. at 615 (citations and quotations omitted). Furthermore, only Congress can waive the sovereign immunity of the United States. *Cal. v. NRG Energy Inc.*, 391 F.3d 1011, 1023-24 (9th Cir.2004); *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir.1998). It must do so explicitly in statutory text. United States v. Nordic Village, Inc., 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ("[t]he 'unequivocal expression' of elimination of sovereign immunity that we insist upon is an expression in statutory text.").

1    In its original motion, the United States claimed that none of

2  the remediation is taking place on a federally owned or operated

3  facility, therefore § 120(a)'s waiver provisions do not apply.  The

4  City, in contrast, argued that the leased AVCRAD and CANG leasehold

5  - separate and distinct from the remediation site - converted the

6  entire OHF into a "facility owned or operated by the federal

7  government."   According to the City, it satisfied *Ashcroft v.*

8  *Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, because it

9  "alleged in its SAC that the response costs were incurred at

10 property that is currently owned or operated by the United States."

11    On April 22, 2010, the United States' motion was granted on

12 grounds   that   the   City   did   not   sufficiently   allege   that

13 AVCRAD/CANG's presence at the OHF airfield *generally* waived its

14 sovereign immunity under § 120(a) of CERCLA:

> The City's primary argument fails on the specific facts
> of this case, as the OHF remediation is taking place on
> property owned by the City, not the federal government.
> (See SAC, Doc. 123-3, ¶ 5 ("The City, which is involved
> solely because it owns the property the Defendants
> contaminated [....]"; Doc. 123-3 at ¶ 38 ("[The United
> States] continues to lease property from the City
> [....]") [...] Moreover, the exhibits/maps attached to
> the SAC demonstrate that the remediation site is
> separate and distinct from AVCRAD and CANG, i.e., the
> alleged "current federal operations."  (See Docs. 123-4
> through 123-6; Doc. 123-3, ¶ 34.)  The mere presence of
> the AVCRAD and CANG facilities - on the OHF airfield
> generally – does not transmute the entire cleanup into
> a remedial action at a 'federally owned or controlled'
> facility; such unaffiliated federal facilities are
> outside the scope of § 120(a)(4) [...]

> The City does not sufficiently allege that there is a
> remedial action at a 'facility' owned or operated by
> the federal government.  See Iqbal, 129 S.Ct. at 1950
> ("[O]nly a complaint that states a plausible claim for
> relief survives a motion to dismiss [...] where the
> well-pleaded facts do not permit the court to infer
> more than the mere possibility of misconduct, the
> complaint has alleged-but it has not 'shown'-that the
> pleader is entitled to relief.").  The City has failed

1
2
3
4
5
6
7

> to state facts sufficient to state a claim under the HSAA. A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929.). The SAC's third cause of action under the HSAA does not meet this standard. See In re Syntex Corp. Sec. Litig., 95 F.3d 922, 926 (9th Cir. 1996) ("Conclusory allegations and unwarranted inferences are insufficient to defeat a motion for judgment on the pleadings."). The United States' motion is GRANTED.

8
9

*City of Fresno v. United States*, --- F. Supp. 2d ----, 2010 WL 1662476 at 20.

10
11

    In a footnote, it was reasoned that the City fused two distinct terms under the CERCLA framework:

12
13
14
15
16
17
18

> [T]he City conflates two distinct definitions /operations: (1) federal operations/facilities, generally; and (2) removal or remedial actions at 'facilities owned or operated by a department, agency, or instrumentality of the United States.' 42 U.S.C. § 9620(a)(4) (emphasis added). Here, the City acknowledges that the United States does not own - or conduct operations - at the remediation site. Instead, it alleges that the United States' adjacent operations - on the larger OHF airfield - constitute applicable 'facilities' under § 9620(a)(4).

19

*Id*. at 20, fn. 22.

20
21
22
23

    In its motion for reconsideration, the City does not allege that the controlling law has changed since the Memorandum Decision. Rather, it argues there was "clear error" in the Court's interpretation of both the law and facts of this case.

24
25
26
27
28

    The basis for the City's current motion is that the Court erred when it held that the City did not sufficiently allege that the remedial action at issue is taking place at a facility owned or operated by the government. According to the City, the court did not follow the appropriate legal standard for ruling on a Rule

37

12(c) motion because the court failed to "take as true" certain "factual allegations" made by the City in its second amended complaint, including: (1) that the federal government "owns" or "operates" the entire OHF based on alleged downgradient contamination from AVCRAD/CANG. However, this is a legal argument, not a factual assertion. Rule 12 does not require the court to take the City's legal arguments as true, or to construe them in its favor.

To support its theory, the City makes a variety of new legal arguments and repeats arguments already rejected by the Memorandum Decision. However, any newly alleged "facts" raised in the City's motion for reconsideration are ignored. *See Fay Corp. v. Bat Holdings I, Inc.*, 651 F. Supp. 307, 308-09 (W.D. Wash. 1987). The City may not use reconsideration as a means to present arguments that could, and should, have been made before the Memorandum Decision was issued. *See, e.g., 389 Orange Street Partners v. Arnold*, 179 F.3d at 665. A motion for reconsideration is not a vehicle to make arguments or present evidence that should have been raised before. For example, as explained in § V(A)(2), the City did not advance its CERCLA § 101(9) arguments in its opposition, nor did it discuss its relevance to § 120(a)(4). In this Circuit, matters that were not presented in the first instance are not considered on a motion for reconsideration.[30]

Here, the City has not presented any newly discovered and

---

[30] Assuming, *arguendo*, that the City satisfies its Rule 59 burden, its allegations do not connect its "facility" arguments to § 120(a)(4)'s remaining language, i.e., the City fails to explain how the United States' alleged downgradient contamination "operates" the OHF as that term is defined under CERCLA.

previously unavailable evidence.[31]  It has not submitted any facts
or law suggesting that there was "clear error of law" and the
initial decision was manifestly unjust.  This issue is not one of
those narrow instances where it is appropriate to grant relief
under Rule 59.  The moving party must show more than a disagreement
with the Memorandum Decision.  Rule 59 motion are not granted
unless there is need to correct a clear error of law or prevent
manifest injustice. *Database Am., Inc. v. Bellsouth Adver. & Pub'g
Corp.*, 825 F. Supp. 1216, 1220 (D.N.J. 1993).  The City has failed
to set forth sufficient grounds to reconsider the April 22, 2010
Memorandum Decision.[32]

---

[31] Even considering the City's arguments, it has not provided
any authority to support its broad interpretation of § 120(a)(4),
which is strictly construed in favor of the sovereign.  *See, e.g.,
Gomez-Perez v. Potter*, 553 U.S. 474, —--, 128 S.Ct. 1931, 1943
(2008) (agreeing that a waiver of the Federal Government's
sovereign immunity must be unequivocally expressed in statutory
text and "will be strictly construed, in terms of its scope, in
favor of the sovereign.").  *Iqbal* requires a party to "plead[]
*factual content* that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged,"
not merely recite the relevant statutory language.  --- U.S. ----,
----, 129 S.Ct. at 1949.  The City's allegations did not, and do
not, provide a plausible factual or legal connection between the
United States' off-site operations and the targeted remediation on
City-owned land.

[32] The City also argues that the Court looked beyond the
pleadings when it relied on the government's assertion that "the
Corps remediated both [the AVCRAD and CANG] sites many years ago."
The Memorandum Decision mistakenly referred to the government's
assertion that it had previously remediated the AVCRAD/CANG
property.  However, this error did not change the sovereign
immunity analysis under § 120(a)(4), i.e., whether the City
sufficiently pled that the OHF/remediation site is a "federally
operated facility" based on AVCRAD/CANG's presence.  Accordingly,
the Memorandum Decision Re: the United States' Motion for Partial
Judgment on the Pleadings as to Plaintiff's Third Claim Under the

1    **The City's Rule 59(e) motion is GRANTED only to the extent the**

2    **April 22, 2010, Memorandum Decision Granting the United States'**

3    **Motion for Partial Judgment on the Pleadings as to the City's HSAA**

4    **Claim is amended as described.   Otherwise, the motion is DENIED.**

5    *//*

6    *//*

7    *//*

8    *//*

9    *//*

10   _____

11   HSAA (Doc. 143), filed April 22, 2010, is amended by:

12       1.    Deleting at page 41, lines 6 through 9, the sentence "The

13           United States also maintains that the property leased by
     the federal government - AVCRAD and CANG - was

14           remediated, therefore the City did not incur any response
     costs on federal property."

15

16       2.    Deleting at page 45, lines 1 through 3, the sentence
     "Second, it is/was impossible for the City to incur

17           response costs at either AVCRAD or CANG because the Corps
     remediated both sites many years ago."

18

19       3.    Deleting footnote 24, at page 45, in its entirety.

20       To the extent the City argues that the Court looked beyond the

21   pleadings to resolve its § 120(a)(4) allegations, the motion is
     DENIED.   As explained in the Memorandum Decision, a Court can

22   consider documents attached to the Plaintiff's Complaint, documents
     incorporated by reference in the Complaint, and matters of judicial

23   notice without converting the 12(c) motion into a motion for
     summary judgment. *See, e.g., United States v. Ritchie*, 342 F.3d

24   903, 908 (2003).  Additionally, documents that were not attached to
     the City's second amended complaint, but were referred to

25   extensively by the City and/or form the basis of the its claims,
     may be incorporated by reference.  *Id*.   Here, the United States'

26   motion for judgment on the pleadings was not converted to a motion
     for summary judgment.   No evidence was considered that requires

27   converting the United States' motion for judgment on the pleadings

28   to a motion for summary judgment.

**V. CONCLUSION.**

For the foregoing reasons:

1.  The City of Fresno's motion to reconsider the April 22, 2010, Memorandum Decision Granting the United States' Partial Judgment on the Pleadings or for Partial Summary Judgment as to Plaintiff's Claim Under RCRA is DENIED.

2.  The City of Fresno's Rule 59(e) motion is GRANTED only to the extent the April 22, 2010, Memorandum Decision Granting the United States' Motion for Partial Judgment on the Pleadings as to the City's HSAA Claim as described, otherwise, the motion is DENIED.

The United States shall submit a form of order consistent with, and within five (5) days following electronic service of, this memorandum decision.

IT IS SO ORDERED.

Dated: __June 30, 2010__    _____/s/ Oliver W. Wanger_____
                            UNITED STATES DISTRICT JUDGE

41